# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| SONYA FOSTER, Individually and<br>On behalf of D.F., a minor, | ) | **CASE NO.** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| TAKE-TWO INTERACTIVE-SOFTWARE, INC.; | ) | |
| ROCKSTAR GAMES UK LIMITED f/k/a | ) | **DEMAND FOR JURY TRIAL** |
| ROCKSTAR NORTH LIMITED and DMA | ) | |
| DESIGN LIMITED; | ) | |
| ROCKSTAR GAMES INC.; | ) | |
| PSYONIX, LLC; | ) | |
| PANIC BUTTON, LLC; | ) | |
| EPIC GAMES, INC.; | ) | |
| ROBLOX CORPORATION; | ) | |
| ACTIVISION BLIZZARD, INC.; | ) | |
| MICROSOFT CORPORATION; | ) | |
| INFINITY WARD, INC.; | ) | |
| TREYARCH CORPORATION; | ) | |
| SLEDGEHAMMER GAMES INC.; | ) | |
| ELECTRONIC ARTS, INC.; | ) | |
| EA SPORTS; | ) | |
| ELECTRONIC ARTS-TIBURON, A FLORIDA | ) | |
| CORPORATION; | ) | |
| SONY INTERACTIVE ENTERTAINMENT LLC; | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs Sonya Foster, Individually and on behalf of D.F., a minor, hereby file their

Complaint against the Defendants—Take-Two Interactive Software, Inc., Rockstar Games UK

Limited f/k/a Rockstar North Limited and DMA Design Limited, Rockstar Games Inc., Psyonix,

LLC, Panic Botton, LLC, Epic Games, Inc., Roblox Corporation, Activision Blizzard, Inc.,

Microsoft Corporation, Infinity Ward, Inc., Treyarch Corporation, Sledgehammer Games Inc.,

Electronic Arts, Inc., EA Sports, Division of Electronic Arts, Inc., Electronic Arts-Tiburon, and

Sony Interactive Entertainment LLC—notifying each Defendant of Plaintiffs' claims for relief as available under Ohio law. In support thereof, Plaintiffs allege and state:

## I.     NATURE OF THE ACTION

1.     Video game addiction, also called internet gaming disorder, is a condition characterized by severely reduced control over gaming habits and increasing priority given to gaming over other activities, resulting in negative consequences in many aspects of a person's life, including self-care, relationships, school, and work.

2.     Video game addiction has negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Those suffering often stop interacting with friends and family, exhibit excessive rage, and no longer enjoy other hobbies or activities outside of their video games.

3.     Video game addiction causes rifts between gaming-addicted minors and young adults and their loved ones—rifts beyond that normally experienced between children and their parents or other family members.

4.     Video game addiction and its harmful consequences are only expanding due to the advent of online gaming, cloud gaming, and streaming of games on any device at any time giving minors unfettered access to "free" games that target those consumers to purchase products within the game to keep playing or for other game perks.

5.     Video game addiction is a world-wide epidemic harming our nation's youth and young adults.

6.     The rapid spread of video game addiction is a proximate result of Defendants' concerted effort to get consumers (*i.e.*, game players) addicted to the Defendants' video games in order to maximize Defendants' profits.

7.    Defendants manufactured, published, marketed, and sold video games and gaming products, including those played by D.F., which Defendants had ***specifically developed and designed*** to cause the addiction experienced by D.F. and other users.

8.    Defendants use traditional game tactics such as feedback loops and reward systems, along with patented designs containing addictive features and technology to ensure its users keep playing longer and spending more on "microtransactions" within the game.

9.    Defendants rely on microtransactions to increase their profits from individual games.

10.    Defendants design their games to keep consumers playing—and spending—by enlisting the help of behavioral psychologists and neuroscientists to conduct state-of-the-art research and to collect data that Defendants use to develop and design their games to be as addictive as possible—especially to minors and young adults.

11.    Defendants make their games addictive, in part, by encouraging long-term, extended game play despite knowledge that such extended play causes physical harm to the human brain – and particularly to a minor's developing brain.

12.    Defendants' motive in developing, designing, manufacturing, publishing, and selling addictive video game software is their own bottom line.

13.    By making their games addictive, Defendants are able to maximize profits after the original purchase or free download. Within their games, Defendants offer significant opportunity to purchase downloadable game content or in-game transactions, known as "microtransactions," to allegedly give players an advantage in the game.

14.    "Microtransactions" often occur as a result of Defendants' use of "friends," targeted advertisements, or other deceptive tactics built into Defendants' video games. Thus, the more times

a player comes back to play a game, the more times they are subjected to Defendants' deceptive and harmful conduct and more likely to spend more money within the game in order to keep playing, thereby increasing Defendants' bottom line.

15.     By keeping minors and young adults playing longer—and spending more money in the game in the process—Defendants are consistently increasing their revenue.

16.     By acquiring—and addicting—users when they are young, Defendants are securing their profit stream by ensuring future engagement and monetization as these young users age.

17.     Defendants are exploiting consumers, particularly minors and young adults, through the use of unfair, unconscionable, and deceptive trade practices and conduct that prioritizes gamer engagement and spending over gamer safety.

18.     Video game addiction impacts thousands of youths and their families across the country, including in Ohio.

19.     D.F. and D.F.'s parent, Sonya Foster, are one of those families who have been negatively impacted by the addiction caused by each of Defendants' products.

20.     Defendants' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts proximately caused D.F.'s gaming addiction and Plaintiffs' other damages, as described herein.

21.     As a result of that gaming addiction, D.F. specifically has experienced severe emotional distress, diminished social interactions, loss of friends, poor hygiene, severe headaches, and withdrawal symptoms such as extreme rage, anger, and physical outbursts.

22.     As a result of D.F.'s gaming addiction, Sonya Foster has been the victim of gamer's rage and withdrawal symptoms which instill fear in Sonya Foster. She has personally experienced

emotional distress, pain, suffering, mental anguish, and loss of money as a proximate result of Defendants' misconduct.

23.     Plaintiffs have been injured and harmed as a proximate result of Defendants' actions and misconduct; for that they are entitled to compensation and other damages under Ohio law.

24.     Defendants, individually and collectively, have willfully and knowingly engaged in fraudulent, deceptive, unfair, immoral, outrageous, wanton, and reckless behavior that damaged and continues to harm not only Plaintiffs, but countless other Ohioans and citizens of the world. For this they should be punished and punitive damages should be assessed against each Defendant for their respective misdeeds and unlawful conduct.

## II.   PARTIES

25.      D.F., a minor, is and at all times relevant to this action, was a citizen and resident of the State of Ohio whose principal place of residence is in Cuyahoga County, Ohio.

26.     D.F. is 12 years old at the time of filing of this lawsuit.

27.     D.F. began playing video games at 4 years old.

28.     D.F. has continued to play video games at an increasing and uncontrollable pace since that time.

29.     D.F. specifically plays Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of Duty Modern Warfare 3, and Madden 24.

30.     D.F. plays these games on PlayStation 4 and PlayStation 5.

31.     D.F. has also subscribed to PlayStation Essentials, which provides access to all games identified herein.

32.     Plaintiff Sonya Foster is, and at all times relevant to this action was, a citizen and resident of the State of Ohio whose principal place of residence is in Cuyahoga County, Ohio.

33.     Sonya Foster is the parent of D.F. and represents D.F.'s interests in this lawsuit. She also seeks redress on her own behalf, seeking damages for loss of society and companionship, as well as for economic injuries and losses sustained as a result of D.F.'s gaming addiction, proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts.

34.     Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

35.     Epic Games is a video game and software developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video game series and platform, either directly or indirectly, to members of the general public within the State of Ohio, including to Plaintiffs.

36.     Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 910 Park Pl., San Mateo, CA 94403.

37.     Roblox Corp. is a video game developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its video game, Roblox, either directly or indirectly, to members of the general public within the State of Ohio, including to Plaintiffs.

38.     Defendant Activision Blizzard, Inc. ("Activision") is a Delaware corporation with its principal place of business at 2701 Olympic Boulevard Building B, Santa Monica, CA 90404.

39.      Activision is authorized to do and does business in the State of Ohio. Activision's registered agent for service of process in the State of Ohio Corporation Service Company 1160 Dublin Road, Suite 400 Columbus, Ohio 43215.

40.      At all times material hereto, Activision developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Call of Duty series, either directly or indirectly, to members of the general public within the State of Ohio, including to Plaintiffs.

41.      Defendant Infinity Ward, Inc. ("Infinity Ward") is a Delaware corporation with its principal place of business at 21255 Burbank Blvd, Ste 600, Woodland Hills, CA 91367.

42.      Infinity Ward is a wholly owned subsidiary of Activision and the only products it develops and produces are the Call of Duty video game series.

43.      At all times material hereto, Infinity Ward developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Call of Duty series, either directly or indirectly, to members of the general public within the State of Ohio, including to Plaintiffs.

44.      Defendant Treyarch Corp. ("Treyarch") is a Delaware corporation with its principal place of business at 3420 Ocean Park Blvd., Santa Monica, CA 90405.

45.      Treyarch is a wholly owned subsidiary of Activision and the only products it develops and produces are the Call of Duty video game series.

46.      At all times material hereto, Treyarch developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Call of Duty series, either directly or indirectly, to members of the general public within the State of Ohio, including to Plaintiffs.

47.     Defendant Sledgehammer Games, Inc. ("Sledgehammer Games") is a Delaware corporation with its principal place of business at 1001 E Hillsdale Blvd., Ste 610, Foster City, CA 94404.

48.     Sledgehammer Games is a wholly owned subsidiary of Activision and the primary product it develops and produces is the Call of Duty video game series.

49.     At all times material hereto, Sledgehammer Games developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Call of Duty series, either directly or indirectly, to members of the general public within the State of Ohio, including to Plaintiffs.

50.     Activision, Infinity Ward, Treyarch, and Sledgehammer Games (collectively, the "COD Defendants") acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Call of Duty series with all the addictive features and technologies contained therein.

51.     Defendant Microsoft Corp. ("Microsoft") is a Washington corporation with its principal place of business at 1 Microsoft Way, Redmond, WA, 98052.

52.     Microsoft is authorized to do and does business in the State of Ohio, and Microsoft's registered agent for service of process is Corporation Service Company 1160 Dublin Road, Suite 400 Columbus, Ohio 43215.

53.     On October 13, 2023, Microsoft acquired Activision Blizzard, Inc. for $68.7 billion. This acquisition has no impact on Activision's liability for the harm it caused Plaintiffs, and Microsoft is responsible for any damages that may be assessed against Activision.

54.     Since its acquisition of Activision and the video game studios operating as subsidiaries of Activision, Microsoft has acted in concert with the COD Defendants in developing,

testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Call of Duty series with all the addictive features and technologies contained therein.

55.    Defendant Take-Two Interactive Software, Inc. ("Take-Two") is a Delaware corporation with its principal place of business at 622 Broadway, New York, NY 10012.

56.    At all times material hereto, Take-Two developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Grand Theft Auto video games, either directly or indirectly, to members of the general public within the State of Ohio including to Plaintiffs.

57.    Defendant Rockstar Games, Inc. ("Rockstar Games") is a Delaware corporation with its principal place of business at 80 State Street, Albany, NY 12207.

58.    Rockstar Games is a video game publisher and wholly owned subsidiary of Take-Two.

59.    At all times material hereto, Rockstar Games developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Grand Theft Auto video games, either directly or indirectly, to members of the general public within the State of Ohio including to Plaintiffs.

60.    Rockstar Games UK Limited f/k/a Rockstar North Limited and DMA Design Limited ("Rockstar North") is a British company with its principal place of business in Edinburgh, Scotland.

61.    Rockstar North is a video game development studio, owned and operated as a subsidiary by Rockstar Games, and the primary product it develops are the Grand Theft Auto video games.

62.     At all times material hereto, Rockstar North developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Grand Theft Auto video games, either directly or indirectly, to members of the general public within the State of Ohio, including to Plaintiffs.

63.     As parent company of Rockstar North and Rockstar Games, Take-Two is responsible for any damages that may be assessed against Rockstar North and/or Rockstar Games in connection with Grand Theft Auto video game products.

64.     Take-Two, Rockstar Games, and Rockstar North (collectively, the "GTA Defendants") acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling Grand Theft Auto video games with all the addictive features and technologies contained therein.

65.     Defendant Psyonix, LLC ("Psyonix") is a California company with its principal place of business at 401 West A Street, Suite 2400, San Diego, CA 92101.

66.     At all times material hereto, Psyonix developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Rocket League series either directly or indirectly, to members of the general public within the State of Ohio, including to Plaintiffs.

67.     Defendant Panic Button, LLC ("Panic Button") is a Texas company with all its members residing in Texas and its principal place of business at 9737 Great Hills Trl., Austin, TX 78759.

68.     At all times material hereto, Panic Button developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold

the video gaming Rocket League series either directly or indirectly, to members of the general public within the State of Ohio, including to Plaintiffs.

69. Defendants Psyonix and Panic Button (collectively, the "Rocket League Defendants") acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Rocket League series with all the addictive features and technologies contained therein.

70. In May of 2019, Epic Games acquired Rocket League and Psyonix for an undisclosed amount, estimated at $200 - $300 million. This acquisition has no impact on Psyonix's liability for the harm it caused Plaintiffs, and Epic Games is responsible for any damages that may be assessed against Psyonix.

71. Defendant Electronic Arts, Inc. ("EA") is a Delaware corporation with its principal place of business at 209 Redwood Shores Parkway Redwood City, CA 94065.

72. At all times material hereto, EA developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Madden NFL video games, either directly or indirectly, to members of the general public within the State of Ohio, including to Plaintiffs.

73. Defendant EA Sports is a Delaware corporation with its principal place of business at 209 Redwood Shores Parkway Redwood City, CA 94065.

74. EA Sports is a video game publisher and a division of EA.

75. At all times material hereto, EA Sports developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold

the Madden NFL video games, either directly or indirectly, to members of the general public within the State of Ohio, including to Plaintiffs.

76.     Defendant Electronic Arts-Tiburon, a Florida Corporation ("EA Tiburon"), is a Florida corporation with its prinicpal place of business at 515 W. Amelia Street, Orlando, FL 32801.

77.     EA Tiburon is a video game developer and a wholly owned subsidiary of EA.

78.     At all times material hereto, EA Tiburon developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Madden NFL video games, either directly or indirectly, to members of the general public within the State of Ohio, including to Plaintiffs.

79.     As parent company of EA Sports and EA Tiburon, EA is responsible for any damages that may be assessed against EA Sports and/or EA Tiburon in connection with Madden NFL video game products.

80.     EA, EA Sports, and EA Tiburon (collectively, the "Madden NFL Defendants") acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling Madden NFL video games with all the addictive features and technologies contained therein.

81.     Defendant Sony Interactive Entertainment LLC ("Sony") is a California company with its principal place of business at 2207 Bridgepointe Pkwy., San Mateo, CA 94404.

82.     Sony is a wholly owned subsidiary of Sony Group Corporation, a Japanese company with its principal place of business in Tokyo, Japan. Sony Group Corporation is, upon information and belief, the sole member of Sony.

83. Sony is authorized to do and does business in the State of Ohio, and Sony's registered agent for service of process is Corporation Service Company 1160 Dublin Road, Suite 400 Columbus, OH 43215.

84. At all times material hereto, Sony designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the PlayStation video game consoles, including PlayStation 4 and PlayStation 5, and video games for use and play on the PlayStation consoles, either directly or indirectly to members of the general public, within the State of Ohio, including to Plaintiffs.

85. At all times material hereto, Sony designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the PlayStation Network, PlayStation Store, PlayStation Plus, and PlayStation Mobile, which are available product features designed for use with the PlayStation gaming consoles and first-party video games, either directly or indirectly, to members of the general public within the State of Ohio, including to Plaintiffs.

86. Sony acted in concert with Activision, Infinity Ward, Treyarch, Sledgehammer Games, Microsoft, Epic Games, Roblox, Rockstar, and Take-Two to distribute, market, supply, and/or sell the Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of Duty Modern Warfare 3, and Madden 24 video games and all in-game downloadable product upgrades and in-game purchases contained therein on the PlayStation Store or through the PlayStation Network in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

87. Each Defendant—with knowledge of D.F.'s age and Ohio residency—targeted D.F. and induced D.F. to enter into microtransactions.

### III.    JURISDICTION AND VENUE

88.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of the *Complaint*.

89.    This *Complaint* brings forth claims for relief arising under the laws of the State of Ohio, including but not limited to allegations that as a direct and proximate result of Defendants placing the defective gaming products into the stream of commerce. Plaintiffs have suffered and continue to suffer both injuries and damages, as described herein, within the State of Ohio that exceed the sum or value of $75,000, exclusive of interest and costs.

90.    This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

91.    This Court has personal jurisdiction over each Defendant because each routinely conducts business in Ohio and has sufficient minimum contacts in Ohio to have intentionally availed itself to this jurisdiction by marketing video games and transacting business in the State of Ohio.

92.    At all relevant times, each Defendant was present and transacted, solicited and conducted business in the State of Ohio through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

93.    Defendants are conclusively presumed to have been doing business in this State and are subject to Ohio's long arm jurisdiction.

94.    At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within Ohio and throughout the United States.

95.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things:

a.   Plaintiffs are all residents of this District and citizens of this State;

b.   each Defendant directed its activities at residents in this District;

c.   each Defendant conducted substantial business in this District;

d.   each Defendant directed its activities and services at residents in this District; and

e.   many of the acts and omissions that give rise to this action took place in this District.

## IV.   FACTUAL ALLEGATIONS

### A.   The Rise of Video Games

96.   A "game" is a closed, formal system that engages players in structured conflict and resolves its uncertainty in unequal outcome.

97.   Video games are closed in the fact that once engaged in the game, the player sets aside their rules for daily life and accepts the rules of the game as the status quo.

98.   A "video game" specifically is an object or device that stores recorded data or instructions generated by a person who uses it, and by processing the data or instructions creates an interactive game capable of being played, viewed, or experienced on or through a computer, gaming system, game console, or other technology.

99.   Unlike traditional arcade-style games, online video games require active, lengthy participation, during which players are exposed to psychological techniques designed to control, manipulate and exploit minors' developing brains to increase game playing time and encourage in-game purchases.

100.   Such manipulation and exploitation are possible—and common—because video games have little regulation beyond the Entertainment Software Ratings Board ("ESRB").

101.    The first video games were sold in the 1970s, and by the mid-1980s, many video game franchises were released that are still in production today.

102.    The industry is yet young, and in a short period of time has rapidly evolved from gaming machines to games on virtual and augmented reality platforms.

103.    Early video game companies would create games and sell them mostly through physical cartridges or discs and the costs of developing the game, and profits, were realized through the sale of their games over a period of time—a long and slow method of earning profits.

104.    A new revenue model based on in-game purchases was created that would allow the publishing companies to earn more profits over a very short period of time. This model is driven by increasing a minor's game play time and keeping them engaged to assure addiction and increase in-game purchases.

105.    Today's technology enables video games on a scale unimaginable 20 years ago. From open-world games with hundreds of square miles to explore to role playing games ("RPGs") that can take hundreds of hours to beat, there is a staggering amount of content in modern games.

106.    The video gaming market grew slowly, taking more than 35 years to reach $35 billion; however, between 2007 and 2018, the industry has grown by more than $100 billion to $137.9 billion.

107.    The global video game industry occupies a special place in the entertainment and media market, now being one of the fastest-growing segments.

108.    In 2023, the video game industry's revenue was $365.6 billion globally.

109.    With the advent of in-game purchasing systems, video games as a consumer product have thrived from in-game purchases. Most of these purchases have been made by minors, including D.G. The explosive growth of the video game industry has been fueled by patented

"monetization schemes" that target minors who are induced to make several in-game purchases, or "microtransactions," of downloadable content.

110.    Often, there is no meaningful disclosure of the inclusion of microtransactions in the game at the time of download or the use of psychological mechanisms employed within the games for consumers or parents to make informed decisions about the appropriateness of games.

111.    In order to entice minors to make such in-game purchases, video game developers and publishers, like Defendants, rely on minors and young adults becoming addicted to their video games so they play for more hours and spend more money on microtransactions.

### B. Microtransactions

112.    Instances where players are able to spend real money for in-game items or perks are known as "microtransactions."

113.    The gaming industry calls such purchases "microtransactions" because a single virtual item is often relatively low in price, but often they are bundled together in "value" packs or games require players to purchase them repeatedly in order to meaningfully advance the game.

114.    Some games allow players to purchase items that can be acquired through normal means; players may opt to make such purchases if they lack the skill or available time to earn the items through regular game play.

115.    Some games, however, heighten exclusivity by including items that can only be obtained through microtransactions.

116.    Microtransactions are often used in free-to-play games to provide a revenue source for the developers and publishers. Such free-to-play games that include a microtransaction model are sometimes referred to as a "freemium."

117.    While microtransactions are a staple of mobile app games, they are also seen on PC software and console gaming.

118.    Microtransactions first appeared in 2006 but did not prove to be a good profitmaking model for developers and publishers until smartphones started to get more powerful and more players started switching to mobile gaming.

119.    In 2012, there was a huge rise of microtransactions mostly because of mobile gaming titles, and they became the normal model across the video gaming industry by 2014.

120.    Microtransactions are most commonly provided through a custom store interface placed inside the app or game for which the items are being sold.

121.    Developers and publishers can also use microtransactions to lock potentially significant content behind paywalls.

122.    Unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are non-essential components of the game and are planned in advance by companies.

123.    The market strategy for the game developers and publishers is that in the long term, the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game.

124.    This is because microtransaction spending can easily—and quickly—add up to hundreds, or even thousands, of dollars.

125.    This new model heavily relies on patented algorithms built into the game, yet concealed from users, to ensure revenues earned by a video game are recurring for as long as the game is available and players are playing it.

126.    Microtransactions were designed to use operant conditioning to ensure the impulsive behavior of players and the gaming environment and peer pressure to drive purchases.

127.    For instance, placing a time limitation on a microtransaction offer may push a user to impulsively buy a particular item. Similarly, a player's desire to be the first among a group of friends to buy an in-game premium item or achieve a higher-ranking will drive a player to make microtransaction purchases.

128.    Today, microtransactions make up 30% of the total gaming revenue earned across the industry.

129.    Microtransactions are not only benefiting the gaming industry publishers and developers; the platforms that allow the microtransactions take a cut of the revenue from each purchase—typically about 30% depending on the size of the app developer. For example, Google, Apple, and Steam all receive revenue for in-game purchases made on games downloaded through their platforms.

130.    While these corporate industries are benefiting from the microtransaction model, the most vulnerable to these manipulative monetization schemes are America's youth and young adults.

131.    Each Defendant knows this, or should be aware of this, because they have purposefully designed their video games to be addictive and rely on microtransactions to make money from this vulnerable population.

**C. The Monetization Schemes Built into Video Games**

132.     Predatory monetization schemes in video games are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until players are already committed, both psychologically and financially.

133.    The schemes use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated play and increased spending among users, especially among vulnerable populations like minors.

134.    Specifically, such tactics may involve, either singularly or in combination: limited disclosure of the product, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

135.    Game developers and publishers utilize many strategies to enhance the predatory monetization tactics in their games. Such strategies include:

a.  The "near miss": convincing players via exciting animation, for instance, that they were very close to winning;

b.  "Chasing": encouraging players to keep playing to get back any money they just lost;

c.  "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window;

d.  "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately;

e.  "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; or

f.  The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

136.    The psychological tactics described in the foregoing paragraph are only one part of the predatory monetization schemes.

137.    Some games also permit a player limited or temporary possession of a certain item to encourage urgent use and/or additional purchasing. Others give only limited disclosure or misrepresentation of important conditions of the purchase, including the long-term value or utility of a purchased item.

138.    Another noteworthy aspect of predatory monetization is the collection and use of individual player data to manipulate the nature and presentation of purchasing offers in ways that maximize the likelihood of the player spending money. Specifically, the games are capable of tracking various player metrics and adjusting their design in automated ways to elicit in-game purchasing.

139.    Such schemes exploit an information asymmetry between purchaser and provider, in that the game system knows more about the player than the player can know about the game. This allows the gaming industry to use its knowledge of the player's game-related preferences, available funds, and/or playing and spending habits to present offers predetermined to maximize the likelihood of eliciting player spending.

140.    Games linked to players' social network pages also gather information from these pages in order to personalize content to players' unique interests and preferences.

141.    As the game system gathers more data on how various types of players behave under certain conditions, the game becomes better equipped to present in-game events and purchasing situations that will elicit the desired behavioral outcome (i.e., spending or playing longer).

142.    The prices of in-game items may be determined by factors that are not disclosed to the player because the algorithm considers the player's available funds and cost sensitivity to

certain items. This allows the game to incentivize continuous spending, while offering limited or no guarantees or protections.

143.    As the playing population as a collective invest more and more time in the game, the game system may become more adept at "knowing" each player, both individually and as part of its group.

144.    Such systems that dynamically adjust in-game item prices and value based on individual player analytics, which were primarily implemented by developers to serve monetary goals and which lack basic transparency to the player, may have the potential to exploit certain types of vulnerable players under certain conditions.

145.    These continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for children to stop understanding the value of the actual money being spent and continue spending more and more.

146.    A few specific examples of predatory monetization schemes include Defendants' sale of loot boxes, pay-to-win models, and rubber-banding.

**i.   Loot Boxes**

147.    A "loot box" is an in-game reward system that can be purchased repeatedly—with real money—to obtain a random selection of virtual items. Loot boxes could contain items that give players an advantage in the game, or cosmetic items that can be used to customize characters or weapons.

148.    Through purchasing a loot box, the player acquires a seemingly random assortment of in-game items.

149.    The low probability of obtaining a desired item in a loot box means that the player will have to purchase an indeterminate number of loot boxes to obtain the item.

150.    Loot boxes require no player skill and have a randomly determined outcome (i.e., prize).

151.    Loot boxes are essentially a lottery—a way for gaming developers, publishers, and even game platforms to increase revenue through underage gambling.

152.    It is common knowledge that gambling addiction is a severe issue and a big risk when playing lottery-style games, so combining these aspects with the psychologically addictive traits of video games is highly dangerous for players.

153.    After being compared to gambling, many games started adding probability to earn respective items in their loot boxes. However, the odds are still extremely against the players; rare items have incredibly low probabilities such as 0.08%.

154.    Loot boxes still have the same designs, opening of animations, and more features to release dopamine leading to players purchasing more microtransactions—much like the tactics used in gambling.

155.    Loot boxes are also ultimately controlled by the gaming developers and publishers, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered in the game design.

156.    Loot boxes result in high revenues for the gaming developers and publishers, like Defendants, because instead of a one-time purchase for the desired item, users may have to buy multiple boxes.

**ii.   Rubber Banding**

157.    Another example of a monetization scheme is "rubber-banding."

158.    Games have long employed rubber-banding to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the player's skill level. For instance, matching computer opponents to a player's skill level.

159.    Game developers and publishers also use this same principle of rubber-banding with microtransactions to ensure that the game's financial requirements are adjusted to match the player's desire and capacity to pay.

160.    In this sense, the "difficulty" of a monetized game may be considered analogous to the player's cost sensitivity or the willingness of the player to make continued in-game purchases.

161.    If an item costs too much, then the players of monetized games cannot strategize to win, but instead must decide between making in-game purchases or not playing at all, or potentially playing without paying, but doing so with significantly diminished in-game capability that generate regular feelings of frustration.

162.    Such technical sophistication in these purchasing systems aims to reduce the player's uncertainty or reluctance regarding purchasing decisions.

### iii.    Pay-to-Win

163.    Some games operate on a "pay-to-win" model, a type of predatory monetization scheme that incentives players who pay more.

164.    Players who are willing to shell out more money get a disproportionate advantage over other players, particularly if the items cannot be obtained through free means.

165.    For example, paying players may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat by ordinary, non-paying players.

166.    Games with such imbalances may prevent the non-paying players from progressing or remaining competitive.

**D. Patents Target Minors to Increase In-Game Spending**

167.    Several video game developers and publishers have incorporated these design strategies into gaming patents that contribute to higher risk consumer behavior.

168.    Game companies often seek to keep their intellectual property confidential. As such, there are very few objective, transparent, or complete accounts on the precise nature of monetization in their games.

169.    Several patents shed light on the innovative video game monetization invented to nudge users into making in-game purchases, including:

a.    U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment LLC, describes an invention that encourages users to make in-game purchases when they face a difficult scenario, such as "kill[ing] a particular monster . . . or player character." Such an offer is referred to by Luchene as an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered."

b.    U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing Inc., similarly describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on his or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

c.  U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (e.g., of interest to) a first player," then locates "a second user that has acquired (e.g., purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

d.  U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

e.  U.S. Patent No. 9,138,639 B1, assigned to Kabam Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

f.  U.S. Patent No. 8,702,523 B2, assigned to Microsoft Technology Licensing LLC, was created to capitalize on a player's tendency to commit to a purchase after investing significant time into the game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user

. . . that the achievement will not be recorded unless they purchase the full version of the game at that time." More specifically, with the patent:

i.  Game play achievements for a free trial version are tracked and maintained even if the console is not connected via a network to the server so that when, and if, the console is eventually connected to the server, the achievements saved locally (e.g., on the console hard drive, on an associated memory unit, etc.) are uploaded and become automatically discoverable to other online users playing the game on different consoles.

ii.  The machine license, a component of the patent, allows any user on the console   access to the downloaded game product, including all game components and product-content, regardless of the console's connection to the internet or the existence of parental controls.

g.  U.S. Patent No. 9,795,886 B1, assigned to EA, allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

h.  U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc., encourages players to make purchases outside of a game to receive in-game benefits and allows players can earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the patent in their video game design to stay connected with the user by requiring

a player to keep their "avatar" charged by earning points by scanning codes on toys, through continued game play, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device that allows a player to play continuously as long as the player earns points playing the game, which is enhanced to allow the player to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

i.  U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

j.  U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes,

another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

k. U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

l. U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a timelimited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

m. U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

n. U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

o. U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

p. International Application No. PCT/US2019/042697, a pending patent application filed by Sony Interactive Entertainment, LLC, would patent technology that suggests microtransactions to players who are stuck in the game to keep them engaging and playing the video game. More specifically, this patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective. The patented method further includes operations for identifying successful attempts of completing the objective by other players and the resources used in doing so, and send selects a resource that is usable by the player to complete the objective based on those resources by the other players in the successful attempts and presents the resource to the player for immediate use. *See also* US 202000030702A1, filed July 24, 2020.

170. There was once a time when such lopsided consumer video game monetization related inventions would have been patent ineligible. However, because of the introduction of these

patents, game developers and publishers can further deceive and harm society's most vulnerable—minor children—while lining their own pockets.

171.    The mere fact that one video game publisher or developer holds a patent on certain monetized technology does not mean that similar schemes are not in other companies' games.

172.    It is common practice for developers and publishers, like Defendants, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buy the rights to the patent outright.

**E. These Predatory Monetization Schemes Attract "Whales" to Defendants' Games**

173.    What players, including D.F., often do not understand is that their gaming experience is not accidental, but rather carefully engineered by the game's manufacturers.

174.     In every game, there are several hundred, or maybe even thousands, of heavy players who spend much more money in the game than the other players.

175.     Companies employ tactics specifically to gain heavy users—or "whales" or "VIPs."—and to induce them into spending more money. For instance, when "whales" get stuck in the game, they are given a bonus to continue because it is better for the gaming companies to give them occasional free things than for the players to get fed up and stop paying.

176.     Gaming companies, like Defendants, have specialized departments within their companies to focus on these "whales" or "VIPs," to stay in contact with them, and to form relationships with them.

177.    To target those who may be likely to spend additional money in the game, game developers and publishers, like Defendants, will monitor players and collect user information, from their game play to their social networks. Companies can then further target these users with advertisements or offers in an effort to increase their revenue at the expense of the player.

178.    The gaming industry is built on those consumers who "maintain the game" and in turn create the revenue for the game companies. The proportion of heavy users significantly increases revenue numbers for these companies. By monetizing player addiction, game companies notably increase their bottom line.

**F. Defendants Include Specific Features in their Games to Keep Players Engaged – and Addicted**

179.    In addition to microtransactions, video games include several additional features to keep players engaged and playing longer, including the use of algorithms, feedback loops, continuously adding new game content, and using tactics to ensure users are creating habits in their gameplay.

180.    Many gaming features now are based on algorithms within the game to manipulate the type of play that users are experiencing.

181.    For instance, Activision holds numerous patents that provide a framework of artificial intelligence to monitor, analyze, and control users' game time to increase game play time and fuel additional purchases.[1]

182.    Upon information and belief, Activision works in concert with the other Defendants to license this patented technology and allow all Defendants to control users' experiences within the game.

183.    Defendants are also utilizing several psychological tools to increase game play time, such as the use of feedback loops.

184.    Feedback loops are systems where the game reacts to how well the player is doing in order to make the games more rewarding, or for tougher games, more challenging.

---

[1]    See Patents assigned to Activision publishing, JUSITIA, https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

185.    Feedback loops are a core part of video games because developers and publishers have a vested interest in making players want to play their games for as long as possible.

186.    There are two kinds of feedback loops: positive and negative.

187.    Positive feedback loops mean that when you're doing well, the game rewards you with things to help you do even better.

188.    Negative feedback loops, on the other hand, add a challenge to a game when you are doing too well.

189.    Feedback loops are used to bring balance to games that would otherwise get too difficult or too boring.

190.    By introducing both positive and negative feedback loops into a game, designers can build a dynamic level of difficulty control.

191.    A player's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core game's challenges is curtailed by the use of negative feedback loops.

192.    When done well, feedback loops enhance the player's experience by maintaining a consistent level of challenge throughout a game, while still rewarding the player for their achievements.

193.    In theory, this creates the holy grail of the games design world, a game that maintains the feeling of challenge and achievement for the entirety of the game and keeps players playing longer.

194.    Gaming companies, like Defendants, also know that the best way to get a player to come back to the game and spend money is to make the game a habit or part of their life.

195.    Creating a habit consists of a cycle of three things: reminder, routine, and reward.

196.    The specific purpose of these rewards is to create a daily routine, and ultimately a habit, of playing the game for the user.

197.    Gaming companies, like Defendants, know this and use deceptive and unfair tactics to keep players coming back multiple times a day to play. For instance, gaming companies, like Defendants, try to addict players to their games by providing daily rewards or time-released rewards to keep players consistently coming back.

198.    Another tactic gaming companies, like Defendants, use to addict players is to add more game content over time thereby keeping users playing over a longer period of time.

199.    By constantly adding downloadable content, e.g., expansion packs and microtransactions, Defendants make it hard for players to finish a game while simultaneously keeping them hooked in the content and the game.

**G. Dark Patterns and Drip Pricing Have Allowed Defendants to Further Exploit Users**

200.    For decades, unscrupulous direct mail marketers and brick-and-mortar retailers have relied on design tricks and psychological tactics, such as pre-checked boxes, hard-to-find and-read disclosures, and confusing cancellation policies, to get consumers to part with their money or data.

201.    The term "dark patterns" was coined in 2010 by user design specialist Harry Brignull to describe the deceptive and manipulative design practices used to trick consumers into making choices that could or may cause them harm—and that they would or may not have otherwise made.

202.    The purpose behind "dark patterns' is to take advantage of consumers' cognitive biases and steer their conduct or delay access to information needed to make fully informed decisions.

203.    Research shows that "dark patterns" are highly effective at influencing consumer behavior.

204.    The use of these manipulative design practices, or "dark patterns," has only grown in scale and sophistication as more and more commerce has moved online, thereby creating ever greater challenges for consumers.

205.    Further challenging consumers is the common practice of using multiple "dark patterns" in combination, rather than in isolation.

206.    "Dark patterns" tend to have even stronger effects when they are combined, so they are rarely used in isolation.

207.    "Dark patterns" have a compounding effect, thereby increasing the impact of each and exacerbating the harm to the consumer.

208.    The use of manipulative design techniques, including "dark patterns," in the digital world can pose heightened risks to consumers. For example, the pervasive nature of data collection techniques, allows companies to gather massive amounts of information about consumers' identities and online behavior, enabling businesses to adapt and leverage advertisements to target a particular demographic or even a particular consumer's interests.

209.    Companies that market online can experiment with digital dark patterns more easily, frequently, and at a much larger scale than traditional brick-and-mortar retailers, to determine which design features most effectively influence consumer behavior. For example, online a company can easily and quickly rearrange products to mimic the consumers' behaviors, but also can easily test new marketing practices and digital dark patterns on consumers, deceiving consumers or manipulating them into taking unwitting or detrimental actions.

210.    Some dark patterns manipulate consumer choice by inducing false beliefs- such as a minor's belief that a skin or other in-game purchase means the child will actually obtain the desired object or game skill level.

211.    Other dark patterns operate by hiding or obscuring material information from consumers, such as burying key limitations of the product or service in dense Terms of Service documents that consumers do not see before purchase.

212.    Free-to-play or "freemium" games are an example of games that fail to disclose to a minor that a game they purchase is not the entire game.

213.    Another variation on the hidden-fee dark pattern is "drip pricing," in which companies advertise only part of a product's total price to lure in consumers, and do not mention other mandatory charges until late in the buying process.

214.    Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction.

215.    Microtransactions built into many video games by design are a form of drip-pricing.

216.    Each Defendant uses, or has used at relevant times, "dark patterns in the design, development, manufacture, advertising, marketing, promotion, supply, and sale of their respective gaming products.

**H. Cloud Gaming Enhances Defendants' Predatory Activities**

217.    Not only do individual games have predatory strategies built in to encourage users' spending and continued play, but several games are also now available on cloud-based systems.

218.    Cloud gaming, or gaming on demand, is a type of online gaming that runs video games on remote servers and streams them directly to a user's device.

219.     Traditionally, games would run locally on a user's video game console, personal computer, or mobile device.

220.     Cloud gaming platforms allow users to stream any game available on the platform at any time.

221.     Cloud gaming eliminates the need for users to purchase expensive computer hardware or install games directly onto a local game system.

222.     This means players have easy access to hundreds or even thousands of games at one time.

223.     What's more, the catalogue of games on streaming platforms is ever-changing and evolving.

224.     The never-ending availability of a wide variety of games encourages users to stay engaged with the streaming platform, by ensuring they always have something new and different to play.

**I.   Defendants' Predatory Schemes Created a Generation of Gaming Addicts**

225.     The feedback loops, other psychological properties, and cloud gaming platforms are designed to keep players continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the game, so the game can bombard the minor with solicitations to purchase additional downloadable game content and/or loot boxes based upon psychological behavioral analyses that employ addiction methodology to seduce the minor to increase playing time and remain in the game. Essentially, the feedback loops, platforms, and predatory monetization schemes work together to addict players to the games.

226.    During the last three decades, video games have become one of the major pastimes and one of the most growing industries worldwide. Today, 67% of all Americans play video games.[2]

227.    In 2008, the American National Purchase Diary ("NPD") group reported that 3% of the 174 million players using PC, MAC, or game consoles were extreme gamers who are playing an average of 45 hours a week. NPD reported that the percentage of extreme gamers had increased to 4% by 2010.[3]

228.    Gaming addiction, also known as gaming disorder or internet gaming disorder ("IGD"), is characterized by severely reduced control over gaming habits, resulting in negative impacts on daily functioning, including personal, social, educational, and occupational responsibilities.

229.    IGD is a growing and prolonged behavioral pattern of gaming, leading to behavioral and cognitive syndromes. Those affected not only experience increased loss of control over gaming, but also increased tolerance and the presence of withdrawal syndrome if unable to play at increasing periods of time.

230.    Gaming addicts are usually 12 to 20 years of age and spend a minimum of 8-10 hours playing video games. Preventing them from playing can lead to tension and anger and they may spend long stretches of time playing—without food or sleep.

---

[2] Hosseini et al., Computer Gaming and Physiological Changes in the Brain: An Insight from QEEG Complexity Analysis. 46(3) APPLIED PSYCHOPHYSIOLOGY AND Biofeedback 301 (2021).
[3] *Id.*

231. IGD can be diagnosed when an individual engages in gaming activities at the cost of fulfilling daily responsibilities or pursuing other interests without regard for the negative consequences.

232. The main features of gaming disorder are impaired control over gaming, increasing priority given to gaming over other activities, and continuation or escalation of gaming despite negative consequences.

233. The Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), the manual used by clinicians and researchers to diagnose and classify mental disorders, recognizes gaming disorder as a condition for further study that warrants more clinical research and experience.

234. Gaming disorder is the only behavioral addiction recognized in the DSM-5.

235. The DSM-5 acknowledges that several consequences from gaming disorder arise within only 5 to 12 weeks of beginning to play.

236. Likewise, gaming disorder, with both online and offline variants, has been included in the International Classification of Diseases ("ICD-11"), the global categorization system for physical and mental illnesses published by the World Health Organization.

237. The American Psychiatric Association ("APA") suggests the effects or symptoms of IGD may be similar to those of other proposed psychological addictions.

238. For instance, IGD may be an impulse control disorder like compulsive gambling.

239. The APA has developed nine criteria for characterizing internet gaming disorder: (1) preoccupation with internet games; (2) withdrawal symptoms when internet gaming is taken away; (3) tolerance, resulting in the need to spend increasing amounts of time engaged in internet games; (4) unsuccessful attempts to control participation in internet games; (5) loss of interests in previous hobbies and entertainment as a result of, and with the exception of, internet games; (6)

continued excessive use of internet games and despite knowledge of psychosocial problems; (7) deceiving family members, therapists, or others regarding the amount of internet gaming; (8) use of internet games to escape or relieve negative moods; and (9) jeopardizing or losing a significant relationship, job, or education or career opportunity because of participation in internet games.

240.    These nine criteria are also outlined in the DSM-5.

241.    Using these nine criteria, the IGD-20 Test was developed and was the first standardized psychometric tool to assess internet gaming disorder.

242.    The IGD-20 Test includes twenty (20) questions designed to assess the extent of problems caused by disordered gaming and the degree of symptoms experienced by gamers.

243.    The IGD-20 Test conceptualized disordered gaming according to the six first-order latent components well-established in behavioral addictions: salience, mood modification, tolerance, withdrawal symptoms, conflict, and relapse.

244.    The Internet Gaming Disorder Scale-Short-Form ("IGDS9-SF") was then created, as a brief standardized psychometric tool to assess gaming disorder.

245.    The IGDS9-SF includes a total of nine items reflecting the nine clinical criteria identified by the APA.

246.    Another commonly used instrument for the measurement of addiction is the Problem Video Game Playing ("PVP") Questionnaire, which is a scale measured by using a survey containing nine yes-or-no questions.

247.    The PVP Questionnaire's survey questions are based on the DSM criteria for substance dependence and for pathological gambling, as well as the literature on addictions.

248. Approximately 3-4% of gamers are addicted to video games. In a 2021 systematic review and meta-analysis, the global prevalence of gaming disorder was found to be 3.05%, meaning as many as 60 million people (or more) are suffering from gaming disorder.

249. These statistics are even higher for minors: 8.5% of youths aged between 8 and 18 suffer from gaming disorder.

250. Comorbidity studies also indicate that individuals with ADHD may have an increased susceptibility to developing gaming disorder.

**J.    Effects of Video Games on Adolescent Brains**

251. Research has shown prolonged gaming damages the prefrontal cortex, causing a loss of grey matter, lower cognitive function, and inability to regulate impulse control.

252. Researchers have concluded that excessive use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction.

253. Clinical evidence has shown that subjects addicted to online games experience biopsychological symptoms and complications. These symptoms may include the traditional symptoms of drug addiction, such as hangover, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

254. In 2008, the United States Federal Communications Commissioner said that online gaming addiction is one of the top reasons for college dropouts in the U.S.

255. Empirical studies indicate that internet gaming disorder is associated with detrimental health-related outcomes.

256. Brain imaging studies have shown that long-term video game playing affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

257.    Other studies have shown excessive use of videogames leads to more negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

258.    The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30.

259.    The executive control center of the prefrontal cortex is essential for weighing risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals.

260.    This may explain why young people are more likely to engage in hours of play while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw on, minors and young adults are less able to weigh negative consequences and curb potentially harmful behavior like excessive video gaming, continuing to impact frontal lobe development.

261.    Brain imaging studies have also shown structural changes in the brain, particularly a reduction in and white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and gray-matter volume (associated with emotions, perception, memory, and motor control). Specifically, several regions of the brain showed reduction in gray-matter volume:



262.    Regions that showed reduced gray-matter volume in IGD participants in more than two studies.[4]

263.    Brain activation studies have shown that videogame playing involved changes in reward and loss of control, and that gaming pictures activate regions similar to those activated by cue-exposure to drugs.

264.    Activation studies also show evidence that individuals with IGD have impaired inhibition, and that video game cues activate craving, attention, and executive function areas of the brain. These cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged exposure.



---

[4] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

265.    Regions that showed activation in response to internet and video game cues in IGD participants in more than two studies.[5]

266.    Structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward.

267.    One comparison study of young adults with a mean age of 24 also revealed that individuals who engage in excessive internet gaming tend to have lower cognitive function, especially in terms of verbal ability and working memory.

268.    Research has shown that a minor with a diagnosis of ADHD, autism, or ODD is at a higher risk of video game addiction, worsening of ability to control impulsivity, and brain damage.

269.    Research has shown that while video games may foster creativity in children, such benefits are outweighed by the negative aspects of addiction, which develop quickly in children and neurodivergent individuals exposed to video games for extended periods of time.

270.    Videogame play is associated with dopamine release similar in magnitude to that of drug abuse and gambling.

271.    These increased dopamine releases in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is taken away or is unavailable to play.

272.    As the APA has explained, gaming disorder specifically leads to the need to spend more time gaming, an inability to reduce time spent gaming, and unsuccessful attempts to quit gaming.

---

[5] *Id.*

273.    As concern over video game addiction grows, the use of psychopharmacology, psychotherapy, twelve-step programs, and use of continually developing treatment enhancements have been proposed to treat this disorder.

274.    By designing and distributing these games with addictive technologies, Defendants ensured that they could increase and extend profits by addicting their most vulnerable users. They created, then exploited, an addiction among this country's most vulnerable, and Plaintiffs seek to hold them accountable.

**I. D.F.'s Addiction, Injuries, and Damages**

275.    D.F. is a 12-year-old individual addicted to video games; specifically, D.F. is addicted to playing Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Modern Warfare 3, and Madden 24.

276.    D.F. spends approximately 5-10 hours per day playing these games.

277.    D.F. cannot refrain from gameplay or spending money in the game.

278.    D.F. plays using his PlayStation 4 and PlayStation 5 consoles.

279.    In total, D.G. has played thousands of hours of Defendants' games:

280.    D.F. has experienced the following as a result of gaming addiction: lack of interest and loss of friends at school, inability to limit game playing time, poor hygiene, withdrawal symptoms when the video games are taken away, and inability to perform schoolwork independently at grade level for D.F.'s age.

281.    D.F. has spent hundreds of dollars on in-game transactions and downloadable content. These funds do not include Plaintiffs' expenditures on PlayStation Essentials, gaming consoles, or copies of games.

282. As a result of each Defendant's intentional, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, as described herein, Sonya Foster has experienced emotional distress, mental anguish, pain, suffering, and has been financially damaged due to D.F.'s uncontrollable in-game spending resulting from D.F.'s gaming addiction and is reasonably likely to continue to experience injuries in the future due to the permanent impact of Defendants' wrongs on Plaintiffs.

**J. Defendants' Conduct Specifically Led to Plaintiffs' Damages**

283. Each Defendant is aware that its video games are harmful to minors and young adults because each Defendant specifically designed its products to addict and prey upon those users' developing brains.

284. To this avail, each Defendant employs behavioral psychologists and/or neuroscientists to develop games that will best utilize psychological tactics to keep players engaged for longer periods of time.

285. Due to the psychological aspects of the games, many of Defendants' products have been banned in other countries to avoid the harm to children that all Defendants are causing daily in the United States.

286. No bans are in place here, and Defendants continue their pattern of addicting and harming our Nation's youth, young adults, and their families, including Plaintiffs.

**K. Defendants' Products**

**<u>Fortnite</u>**

287. Fortnite is an online video game and game platform designed, developed and published by Epic Games.

288.     Fortnite, first released by Epic Games in 2017, is available to public to play in six distinct game mode versions: *Fortnite: Save the World, Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival*.

289.     *Fortnite: Save the World*, released as a paid early access game in 2017 and as a premium game in 2020, is a player-versus-environment, cooperative hybrid tower defense-shooter and survival game in which up to four players collaborate fight off zombie-like creatures and defend objects with traps and fortifications they can build.

290.     In *Fortnite: Save the World*, players work together on missions while fighting off zombie-like creatures and avoiding the effects of an encroaching cataclysmic storm, and, based on the success of the missions, players are awarded a number of in-game items, which includes but is not limited to hero characters, weapon and trap schematics, and survivor rewards, which can be leveled up through gained experience, to improve gameplay.

291.     *Fortnite Battle Royale,* released in 2017 as a free game supported by microtransactions, is a player-versus-player, battle royale game that a user—playing alone, in a duo, or in a 3-4 player squad—fights against up to 100 other players to be the last person (or team) alive.

292.     In *Fortnite Battle Royale,* after being airdropped weaponless from a "Battle Bus" into the game's map, game players must scavenge for weapons, items, resources, and vehicles while trying to stay alive and attack and eliminate other players—all while the safe area of the map shrinks down in size due to an incoming toxic storm.

293.     *Fortnite Creative*, released in 2018, is a survival sandbox game mode that allows users to create games such as battle arenas, racecourses, and platforming challenges; gives users

complete freedom to "spawn" or create any item from *Fortnite Battle Royale* on a personal island; and supports Unreal Editor for Fortnite so that players can edit worlds using Fortnite assets.

294.    *Lego Fortnite*, released in December 2023 and developed by Epic Games with the Lego Group, is a survival sandbox game that provides game players the opportunity to play as Lego Minifig versions of characters as they collect materials, build various buildings, craft various weapons and tools, and fight monsters.

295.    *Rocket Racing,* released in December 2023 and developed by Epic Games with Psyonix as a spin-off title to *Rocket League*, is a Fortnite game mode that allows players to race vehicles, gaining speed boosts from special lanes sections or by drifting, as well as the ability to jump and racing on vertical and inverted surfaces, while avoiding obstacles on the course.

296.    *Fortnite Festival*, released in December 2023 and developed by Epic Games with Harmonix, is a rhythm game in which the user can either play (a) the "Main Stage" hitting notes in a rhythm as either Lead, Guitar/Bass, Drums, or Vocals, or (b) the "Jam Stage" cooperating with other players to make remixes using any part of any song built into the game design.

297.    *Lego Fortnite, Rocket Racing,* and *Fortnite Festival* game modes interface with Fortnite's battle pass system, include microtransactions, and offer new rewards associated with each distinct game mode.

298.    All Fortnite game modes, while offering different content, share the same general gameplay design and are powered by the same game engine (Unreal Engine)—all of which have been internally developed and made available by Epic Games.

299.    Each Fortnite game mode uses similar graphics, art assets, and game mechanics designed and developed by Epic Games.

300.     *Fortnite: Save the World* is a pay-to-play video game product that is available for play on PlayStation 4, Xbox One, and personal computers running macOS or Windows. [6]

301.     All other Fortnite versions—*Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival*—are free-to-play video game products available for play on all available gaming consoles, including Sony's PlayStation 4 and PlayStation 5, Microsoft's Xbox One and Xbox Series X/S, and Nintendo's Switch.

302.     The *Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival* game modes also can be played on Android and iOS mobile devices, as well as personal computers running macOS or Windows. [7]

303.     *Fortnite Battle Royale,* and the other Fortnite game modes, can be downloaded and played for free through Microsoft's Xbox Cloud Gaming without need for a Xbox Game Pass subscription:

---

[6] In 2020, due to legal battles between Epic Games and Apple, Inc., the macOS client of *Fortnite: Save the World* remained downloadable and players who had downloaded the game for play using a macOS client could still play then game, however, it would not be updated.  Since May of 2022, *Fortnite: Save the World* has been available for play via Xbox Cloud Gaming and GeForce Now on macOS devices.

[7] In 2020, the iOS and Android clients of *Fortnite Battle Royale* were removed by Apple, Inc. and Google, LLC—and became unavailable on certain mobile phones—as a result of legal battles between those companies and Epic Games. The game remained playable if it had already been downloaded on mobile devices running either an iOS or Android client.

YOU DO NOT NEED AN XBOX GAME PASS PAID SUBSCRIPTION TO PLAY FORTNITE THROUGH XBOX CLOUD GAMING. ALL YOU NEED IS A FREE MICROSOFT ACCOUNT, HIGH-SPEED INTERNET CONNECTION, AND COMPATIBLE DEVICE. ONCE YOU'RE READY, GO TO XBOX.COM/PLAY TO START PLAYING WITH MOBILE TOUCH CONTROLS OR A SUPPORTED CONTROLLER. SEE OUR FAQ BELOW FOR MORE DETAILS.

304.    Fortnite is also available to download for free on multiple video game platforms with the Epic Games Store app or Valve's Steam app.

305.    All Fortnite game modes are cross-platform play compatible, but to use that option, product users are required to have an Epic Games account for cross-saving between platforms.

306.    All Fortnite game modes are monetized through the use of V-Bucks, an in-game currency that can be purchased with real-world funds.

307.    In *Fortnite: Save the World,* V-Bucks also can be earned through completing missions and other achievements.

308.    In *Fortnite: Save the World,* V-Bucks can be used to buy loot boxes, in the form of llama-shaped pinatas, to gain a "random" assortment of items.

309.    In all other Fortnite game modes, including *Fortnite Battle Royale*, V-Bucks can be used to buy cosmetic items like character models.

310.    In *Fortnite Battle Royale,* V-Bucks can be used to purchase a battle pass, which is a tiered progression of customization rewards for gaining experience and completing certain objectives during the course of a *Battle Royale* season.

311.    Epic Games developed Fortnite games to make sure that the players keep coming back and playing Fortnite.

312.    In the first two weeks of the release of *Fortnite Battle Royale*, there were over 10 million people playing the game.

313.    In June of 2018, less than a year after the release of *Fortnite: Save the World, Fortnite Battle Royale,* and *Fortnite Creative*, there were more than 125 million Fortnite players and Epic Games's monthly earnings totaled hundreds of millions of dollars.

314.    From 2017-2019, Fortnite video games had generated over $9 billion in gross revenue through microtransactions and in-game purchases.

315.    In 2021 alone, Fortnite generated $5.8 billion in revenue.

316.    Fortnite has an average of 239 million monthly players, and a potential peak of 15 million players in a day.

317.    Fortnite gained immense popularity because of its clever manipulation of human psychology.

318.    The team that developed Fortnite included psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop a game that was as addictive as possible.

319.    One tactic used by Epic Games is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. Essentially, when a player loses a round, they lose by only a slight margin, compelling them to play another round because they were just a few moves away from winning. When players lose, they rationalize their defeat and often tell themselves that what stopped them from winning was the smallest mistake. As a result, players want to play another match over and over again.

320. The "near miss" effect means that when users perceive that they lost by only a slight margin, they do not actually have to win a match to feel the high of a win. Such strategy lies in getting users close to the feeling of winning, because when they are that close, they feel the same buzz and go on to play more rounds. On the other hand, when they do win a round, they win a lot of perks, giving them a spurt of dopamine and the adrenaline rush to play again.

321. In the hopes of increasing their rank in the game through wins, players continue to play without any pause or rest.

322. Fortnite also uses random reward tactics—known in psychology as the "variable interval schedule"—the idea that randomized small wins will continue to draw in users.

323. With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

324. Additionally, the design of Fortnite purposefully keeps players drawn in. For instance, the bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale games.

325. Similarly, the mechanics of the game inject elements of variety, allowing players to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more—an intentional design through which Epic Games ensures that Fortnite players never once get bored during gameplay.

326. To keep players even more engaged, Epic Games often rolls out updates that keep players busy with engaging and fresh features, new maps, live events, and the latest trends. Such updates can also remove minor glitches that may be bothering the players as well.

327. Fortnite also keeps players coming back daily by giving "Daily Quest" assignments that players can complete to earn V-bucks:



328.    Players will thus continually log into the game to complete these quests and earn V-bucks for in-game spending.

329.    These features, combined with the ease of accessibility—the game is free to play on multiple platforms and devices—fosters addiction in minors and young adults because it draws players in and allows them to play nearly anywhere at any time.

330.    Upon information and belief, Epic Games has also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Fortnite games.

331.    Epic Games has failed to disclose the risks of harm purposefully built into its game.

332.    Epic Games does not disclose any of the psychological tactics or addictive features it purposefully includes in Fortnite to any of its users.

333.    Several studies have concluded that Fortnite is more addictive than heroin and other illegal drugs.

334.    Epic Games does not warn the public that its Fortnite game products are addictive and likely to cause brain damage, particularly in minors and neurodivergent individuals, when used as intended.

335.    Epic Games touts its game as "educational" and markets it for use in the classroom, including but not limited to offering "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:



336.    Engaging—and addicting—children early and in environments such as their classroom serves only to increase Epic Games's revenue through continued play of young users, at the expense of these users' mental and physical health.

337.    Epic Games does not adequately inform users of the inherent risks involved with using and playing any Fortnite video game product.

338.    None of the game modes in the Fortnite game series includes a warning that the game was designed to addict and harm users.

**Roblox**

339. Roblox is an online video game, developed and published by Roblox Corp., formally released for use by consumers in September of 2006.

340. Roblox Corp.'s "mission" for Roblox is have a billion people actively using and playing its game each day:



341. Between its 2006 release and 2015, Roblox was only available for play on personal computers and mobile phones; however, with the release of Roblox for play on Microsoft's Xbox One gaming console in November of 2015 and the Oculus Rift virtual reality gaming headset in April 2016, the numbers of people (particularly minors) grew exponentially.

342. Roblox Corp. also saw an accelerated increase in the numbers of consumers downloading and playing Roblox as a result of the Covid-19 pandemic.

343. As of August of 2020, Roblox had over 164 million monthly active users, with more than half of those users being American children under age 16.

344. The numbers of consumers, particularly minors, using and playing Roblox continued to grow in 2023, when Roblox Corp. released versions of its Roblox product for play on Sony's PlayStation 4 and the virtual reality gaming headsets, Meta Quest 2 and Meta Quest Pro.

345.    Roblox Corp. markets Roblox as accessible on any device and, as of 2024, has released Roblox for use and play on personal computers, video gaming consoles, mobile phones, tablets, and virtual reality video gaming headsets:



346.    Currently, Roblox has over 66 million daily active users and over 217 million monthly active users, with more than 50% of consumers playing Roblox being under age 13.

347.    Roblox Corp. describes Roblox as an online, social gaming platform and game creation system that allows users to play games (or "experiences") built within Roblox and to program their own games (or "experiences") using Roblox Corp.'s proprietary engine, Roblox Studio.

348.    Roblox Corp. designed the game-creation aspect of its product to allow players to create their own Roblox video games, as well as purchasable, one-time "game passes" and "developer products" microtransactions, for play and purchase by other Roblox users, including minors.

349.    Roblox Corp. designed the social-gaming aspect of its product to allow players to play Roblox games (or experiences) created by other users, which includes allowing players to buy, sell, and create virtual items, accessories, and limited-availability products for use in gameplay.

350.    Roblox is free to play; however, Roblox is designed to encourage in-game purchases and product upgrade microtransactions, which can be purchased using Robux, the game's virtual currency.

351.    Robux can be obtained (a) purchased with real currency; (b) received a part of a recurring stipend given to users with a Roblox Premium membership; and (c) earned from selling "game passes" or developer products" to other Roblox players.[8]

352.    Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

353.    For instance, corresponding with the increase of Roblox players due to the Covid-19 pandemic, Roblox Corp. earned $2.2 billion in revenue from Roblox in 2022—a 16% increase from 2021 earnings, which had been increased by 107% from its 2020, which had themselves been an 111% increase over 2019.

354.    Roblox Corp. specifically designed Roblox with certain addictive properties—at the risk of children's mental and physical health—to profit from product user's extended, long-term gameplay and corresponding in-game spending.

355.    Roblox Corp. hired psychologists and scientists to work with software engineers and game developers to ensure that their game includes the best psychological traits and technologies for player retention and addiction.

356.    Roblox Corp. used numerous addictive principles and technologies in Roblox's design. For example, in Roblox, players can create games and maps for other users to try and play, making it a challenge in and of its own. Through research and product development, Roblox Corp.

---

[8] In the latter instance, should the user choose to exchange Robux acquired from purchases made by other Roblox players for real world currency, Roblox Corp. retains a percentage of the revenue.

learned that when playing games and completing challenges like this, a user's brain releases dopamine—the neurotransmitter in the brain that enables an individual to feel happiness and pleasure—and triggers the game player's brain to seek these dopamine hits on a more regular or compulsive basis leading to abuse, addictive behavior, and video game addiction.

357.    Additionally, the variety within Roblox ensures that users are never bored and want to stop playing the game; there are always new challenges, maps, and characters to try, making the game feel like an ever-evolving entity that never stops providing entertainment.

358.    The ability for users to create their own games and challenges, combined with users' ability to spend real-world funds to change their avatar's image and abilities, makes sure that the gaming experience is different for players each time they log in.

359.    Such constant variety keeps players "hooked," or coming back daily and playing for hours.

360.    Roblox's "social gaming" design allows users to interact with friends or other users within the game—and creates a competitive environment whereby players are presented with microtransactions and in-game product purchases and pressured to spend money to keep up with their Roblox friends and competitors.

361.    Roblox Corp. makes in-game spending as easy as possible, and designed Roblox with addictive features to target minors and encourage them to engage in microtransactions in order to advance in the game, resulting in addicted and incompetent users quickly spend large sums of money inside the game without their parents, guardians, or other family members' knowledge or consent.

362.    Roblox Corp. does not adequately inform users of the inherent risks involved with using and playing Roblox or that the game was designed to addict and harm users.

363.    Though it is equipped with the knowledge of the addictive risks inherent in its game, Roblox Corp. has failed to inform the public, users, or parents of such risks.

364.    Roblox Corp. describes its game as an educational tool for children: "Roblox provides a fun, supportive, and educational space where your child's imagination can thrive."[9]

365.    Roblox Corp. even markets itself to educators, encouraging the use of Roblox in learning environments:



366.    While marketing its video game as an educational tool to benefit minors and neurodivergent individuals, Roblox Corp. does not disclose the psychology and addictive characteristics behind Roblox's design or that Roblox contains numerous addictive principles that are negatively impacting minors' and young adults' livelihoods, including their ability to learn and engage in critical thinking.

**Call of Duty**

367.    Call of Duty is a first-person shooter game series that simulates infantry and combined arms warfare.

---

[9] https://corporate.roblox.com/faq/

368.    Call of Duty was first released in 2003; however, the COD Defendants release annual versions of the game.

369.    Currently, there are 22 mainline versions of the Call of Duty video game available for play on Microsoft's Xbox game consoles, Sony's PlayStation game consoles, Android and iOs based mobile devices, personal computers, and Nintendo's game consoles (excluding the Nintendo Switch).

370.    Each Call of Duty version has been published by Activision, with design and development coming from Infinity Ward (2003 to present), Treyarch (2005-present), and Sledgehammer Games (2011 to present). Raven Software Corporation, a wholly owned part of Defendant Activision, was and is also the developer of Call of Duty games from 2016 to the present.

371.    Call of Duty is the most successful video game franchise created in the United States, and the fourth best-selling video game franchise of all time.

372.    As of April 2021, the series has sold over 400 million copies.

373.    Each version of Call of Duty is based on the same design and incorporates largely similar product components, varying mostly with respect to the version's storyline, guns, and abilities.

374.    Call of Duty offers both single-player and multiplayer modes.

375.    While there are several multiplayer shooter games on the market, Call of Duty is popular because it is designed and developed with specific, addictive features.

376.    For instance, Call of Duty involves unlock progression, wherein each kill, assist, or win all seep into a feedback loop that unlocks new equipment as players progress.

377.    Similarly, each gun used gets better the more a player uses it, with new attachments becoming available with more points scored.

378.    The rewards built into the Call of Duty games are immediate and are a constant stream of progression, or feedback loop, that allows players to feel they are making constant progress toward unlocking everything in the whole game.

379.    The COD Defendants designed the Call of Duty games with these feedback loops— a form of operant conditioning that is harmful to youth and neurodivergent individuals—to target the chemical reward receptors of game user's brains.

380.    With operant conditioning like feedback loops, players are reinforced to enact the correct behavior: in this case, making "kills" to earn extra game content.

381.    Combining these addictive feedback loops with fast-paced play, satisfying graphics, sounds, and other dopamine lifts make the Call of Duty franchise extremely addicting to players, particularly minors and neurodivergent individuals.

382.    The COD Defendants and Microsoft were aware that the Call of Duty games included significant psychological aspects to encourage continuous game play and eventually lead to the addiction of its plays—especially minors and neurodivergent individuals.

383.    The COD Defendants specifically designed the Call of Duty games in concert with psychologists and neuroscientists to discover the best addictive aspects to include in the design of their video game.

384.    Activision patented several of these addictive technological features used in the Call of Duty games.

385.    Upon information and belief, the COD Defendants and Microsoft have also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Call of Duty games.

386.    The COD Defendants also utilize several schemes to increase game time, consequently increasing in-game spending on downloadable content and microtransactions.

387.    Several of the Call of Duty versions include loot box schemes, and others include "battle passes" which allow users to unlock additional tiers of game play for a certain price:

> If you've already experienced the full version of *Call of Duty®: Black Ops Cold War* or *Modern Warfare®*, you are probably familiar with the Battle Pass system. For those that aren't, here's how it works:
>
> The Battle Pass has 100 tiers of content for you to progress through and earn once you've purchased the Battle Pass.
>
> To advance through these tiers, you simply play the game (either *Warzone*, *Black Ops Cold War*, or *Modern Warfare*). The longer you play, the more Tier progress you get. Sometimes, there are events where Double Tier progress can be gained, and it does exactly what you'd expect; double the rate at which you get Battle Pass Tiers through time played.
>
> Through the Battle Pass system, everyone can unlock and enjoy tiers of free content, and all functional content that has an impact on game balance, including base weapons and attachments, can be unlocked simply by playing the game.
>
> So, to recap: you play the game, you get Battle Pass Progress which unlocks Tiers, and then you get rewards from Tiers. Yes, it's that simple. [10]

388.    While users can play 20 of the 100 levels for free, to continue gameplay through additional "tiers," a user has to pay 1,000 "Call of Duty Points" which equates to $9.99 in real-world funds:

---

[10]     https://www.callofduty.com/content/atvi/callofduty/warzone/web/fr_ca/strategyguide/pre-game-preparation/wz-battle-pass.html

**Free Tiers (of the Battle Pass system):** Everyone can earn over 20 free tiers of content, including two functional weapons just by playing.

**Wartracks:** Among the rewards that can be earned at specific Free Tiers are Wartracks, packs of popular songs from the *Call of Duty* universe and in the real world! Equip a track to a specific vehicle in the Vehicle Customization menu (like Battle Horns), then as soon you hop in, the music gets turned up. Your entire squad can listen to the beat while you drive, and let the song guide you to your primary objective – survival.

**Battle Pass:** Players looking for the ultimate customization can purchase the Battle Pass for 1,000 *Call of Duty®* Points and get access to unlock up to 100 tiers of content. These Tiers include scores of Rare, Epic, Legendary, and occasionally Ultra weapon blueprints, Operator skins, Operator Missions, and more, including a new Operator at Tier 0 in most, if not all, seasons.

**Dual Reward Tiers:** Some tiers within the Battle Pass include two rewards: one for *Black Ops Cold War* and one for *Warzone*. These are marked within the Battle Pass, offering those who own *Black Ops Cold War* with their own special item in addition to one they can use in *Warzone*.

**Battle Pass Bundle:** Purchase the Battle Pass Bundle and get access to everything you get with the Battle Pass, plus 20 Tier skips which grant instant access to your next 20 tiers of content.

**Tier Skips:** Buy individual Tier skips for 150 COD Points.

You can purchase at any time without missing any content. If you choose to purchase the Battle Pass after already ranking up a few tiers, no problem: You'll immediately be awarded everything from the Tiers you have already unlocked through gameplay. [11]

389.    The COD Defendants have designed the game to include microtransactions, which include loot box microtransactions known as "Advanced Supply Drops," that are earned through gameplay or are purchasable through in-game stores.

390.    The COD Defendants first introduced microtransaction as part of their Call of Duty video games in 2018, but with the release of *Call of Duty: Modern Warfare* in 2019, microtransactions—and specifically Advanced Supply Drops—became a key design component of the Call of Duty video game series.

391.    The COD Defendants target players with Advanced Supply Drops and other microtransactions utilizing patented technology and undisclosed trackers embedded in the game.

392.    Advanced Supply Drops encourage players to bolster their Armory and customize their Operator. More specifically, the COD Defendants use Advanced Supply Drops to keep players, particularly minors, engaged and spending Call of Duty Points[12] on these microtransactions.

---

[11]    https://www.callofduty.com/content/atvi/callofduty/warzone/web/fr_ca/strategyguide/pre-game-preparation/wz-battle-pass.html

[12] Call of Duty Points are a form of in-game currency that have been purchased using real world money, a gift card, a rewards code, or Depot Credits (which are points earned by playing the game).

393.     Each Advanced Supply Drop microtransaction includes three random loot items, with a guarantee of at least one weapon variant and at least one item of Professional rarity or greater.

394.     Items purchased during an Advanced Supply Drop can either be used to upgrade loadouts and personalize an Operator or can be redeemed for experience points, or "XP."

395.     The COD Defendants and Microsoft include Advanced Supply Drops in the game because they want players to be engaged and spending money in the game for a long time, and they knew that these impulse triggers and "special' prizes would play on users' psyche and mental stage of development.

396.     The COD Defendants have also launched a Call of Duty App as a companion product for the game.

397.     The COD Defendants have made the Call of Duty App available to minors and adults indiscriminately.

398.     The Call of Duty App provides announcements of upcoming tournament events, links to E-Sports betting sites, and publishes the gaming stats of users, including minors—and to do so it tracks users' game usage and collects other data from those users, including minors:



399. Though the COD Defendants and Microsoft know of the addictive features and technology included in the Call of Duty games, such as those features and technologies described herein, they do not inform their users of the risks inherent with playing this game.

400. The COD Defendants and Microsoft do not adequately inform users of the inherent risks involved with using and playing Call of Duty or that the game was designed to addict and harm users.

**Grand Theft Auto**

401. Grand Theft Auto is a series of action-adventure games focusing on an open world where players complete missions to progress an overall story, as well as engage in various side activities.

---

[13] https://www.callofduty.com/blog/2018-09/welcome

402.    The Grand Theft Auto video game series is primarily designed and developed by Rockstar North and published by Rockstar Games, with both companies being controlled and operated by Take-Two as wholly owned subsidiaries.

403.    The GTA Defendants released the first Grand Theft Auto video game in 1997, and since then has released five versions of the game.

404.    Grand Theft Auto has been played by over 30 million individuals.

405.    Grand Theft Auto V ("GTA V"), released in 2013, is the second-best selling video game of all time with over 190 million copies shipped and sold to consumers.

406.    In total, the Grand Theft Auto franchise has generated over $8.33 billion in revenue since Grand Theft Auto V's launch in 2013.

407.    The Grand Theft Auto video games, including GTA V, can be played on Microsoft's Xbox and Sony's PlayStation gaming consoles, personal computers running Microsoft Windows, and mobile devices.

408.    In developing GTA V, the GTA Defendants designed the video game to take advantage of and push the graphical capabilities of Microsoft and Sony's video game console systems.

409.    The GTA Defendants also designed, developed, and released an online version of Grand Theft Auto, Grand Theft Auto Online.

410.    Grand Theft Auto Online, released in 2013, is an online multiplayer mode that the GTA Defendants designed and developed to work in tandem with the single-player mode and to provide user's extended play in a continually evolving world.

411.    Each game in the Grand Theft Auto series centers on a different respective protagonist who attempts to rise through the criminal underworld due to various motives, often accompanying themes of betrayal.

412.    Several film and music celebrities have voiced characters in the game.

413.    The Grand Theft Auto Defendants have designed the games with good graphics, a captivating storyline, and smooth and predictable controls to enhance players' gaming experience.

414.    Grand Theft Auto also includes endless arrays of activities and challenges to continually engage users and ensure they are never bored.  From skydiving, playing darts, watching movies, and even arm wrestling, the games have near limitless things for players to do to keep them rapt for a long time.

415.    Additionally, Grand Theft Auto gives players a chance to "drive" their dream car around this fictional world with unmatchable replicas of famous supercars; the quality designs of these cars combined with speedy performance and crisp controls encourage players to play longer and/or spend more money in order to obtain the flashy cars, guns, and clothes in the game.

416.    Grand Theft Auto allows users to play in different game modes—either completing free mode missions or competing in different adversary modes.

417.    One such adversary mode is the opportunity to race other individuals online, with different classes of vehicles and different areas of the game map.  The unlimited possibilities of track layouts across the entire map, as well as the element of competition, give players variety and the dopamine rush to keep playing.

418.    The game rewards players who win these races and other adversary challenges with in-game currency and other rewards.

419.    During certain weeks or special events, the adversary modes reward winners with double, triple, or even quadruple rewards—encouraging players to increase their play time and play each time these special event times.

420.    Players do not have to just compete against others, however; the games also offer cooperative modes where friends can carry out missions or "heists" together in the storyline.  The ability to play with friends—and/or the pressure from friends to play the games—is another reason why so many individuals play Grand Theft Auto video games.

421.    After earning in-game "money" through missions and activities in the game—or by purchasing the in-game funds with real-world money—players can use these funds to buy additional guns, clothing, accessories, and even cars in the Grand Theft Auto games.

422.    In some versions of the game, players can visit in-game "websites" on their character's mobile phone to purchase these items—including high-end luxury vehicles.



423.    In addition to the downloadable product upgrades available for purchase in the game, the GTA Defendants also release occasional free in-game upgrades or prizes to keep players coming back for more.

424.    Each day players login to play, Grand Theft Auto provides them with daily objectives to complete for even more in-game funds and progress points.

425.    The GTA Defendants know that all of these features in their games work together to addict users and further abuse and compulsive use of the games.

426.    The GTA Defendants specifically developed their games along with psychologists and neuroscientists to include such addictive psychological traits.

427.    By encouraging users to keep playing the game and build habits around it, the GTA Defendants know that players are more likely to spend real-world funds within the game.

428.    At the expense of users' mental and physical well-being, the GTA Defendants fail to inform the public, users, or parents that the game was designed to addict and harm users or of the inherent risks or negative consequences that can arise from playing their game.

429.    The GTA Defendants intend to introduce and addict as many users as possible in order to increase their own profits as these users continue playing—and spending.

430.    Though the GTA Defendants know of the addictive features and technology included in the Grand Theft Auto games, such as those features and technologies described herein, they do not inform their users of the risks inherent with playing this game.

431.    The GTA Defendants do not adequately inform users of the inherent risks involved with using and playing Grand Theft Auto, or that the game was designed to addict and harm users.

**Rocket League**

432.    Rocket League is a "soccer" game played with rocket-powered cars.

433.    Rocket League is developed and published by Psyonix, and ported to Xbox One, PlayStation 4, and Nintendo Switch by Panic Button.

69

434.    Psyonix and Panic Button (collectively, the "Rocket League Defendants") work in concert to create the Rocket League games that ultimately reach consumers, like Plaintiffs.

435.    Rocket League is available on numerous platforms, including PC and various gaming consoles.

436.    Rocket League has been one of the leading games supporting cross-platform play between computers and gaming consoles.

437.    The Rocket League game was first released in 2015, and while no different versions of the game have been released, several "patches" or updates have been made to the game on numerous occasions.

438.    Rocket League became a free-to-play game on June 23, 2020.

439.    As a result, the number of active players hit an all-time high with over 100 million users playing Rocket League.

440.    It is estimated that the revenue from Rocket League game sales alone is over $467 million, with another $476 million from in-game purchases and other sources of revenue.

441.    During play, up to eight players are assigned to each of two teams, and use their rocket-powered vehicles to hit a ball into their opponent's goal and score points over the course of a match, essentially combining aspects of indoor soccer with elements of a demolition derby.

442.    Rocket League involves both single-player and multiplayer modes.

443.    Matches are usually five minutes long, with a sudden death overtime if the game is tied at that point.

444.    Numerous game modes, known as "mutators," modify some aspects of gameplay, allowing players to consistently experience varied gameplay.  For instance, mutators can increase

or decrease gravity, ball size, speed, or bounciness, incorporate unusual power-ups, or change the type of game completely.

445.    The different games available also include a hockey-style and basketball-style competition.

446.    Rocket League is monetized through downloadable content, as well as "Blueprints" which are offered to players during end-of-match drops and give players the opportunity to obtain specific items.

447.    Blueprints can be purchased with earned in-game currency or with real-world funds.

448.    Additionally, Rocket League includes an Item Shop that updates daily.



[14]

449.    The Rocket League Defendants know that all of these features in their games work together to addict users and further abuse and compulsive use of the games.

---

[14]

https://twitter.com/RLDailyShop/status/1742657742123205100?ref_src=twsrc%5Egoogle%7Ct
wcamp%5Eserp%7Ctwgr%5Etweet

450.    The Rocket League Defendants specifically developed their games along with psychologists and neuroscientists to include such addictive psychological traits.

451.    By encouraging users to keep playing the game and build habits around it, the Rocket League Defendants know that players are more likely to spend real-world funds within the game.

452.    At the expense of users' mental and physical well-being, the Rocket League Defendants fail to inform the public, users, or parents that the game was designed to addict and harm users or of the inherent risks or negative consequences that can arise from playing their game.

453.    Instead, the Rocket League Defendants intend to introduce and addict as many users as possible in order to increase their own profits as these users continue playing—and spending.

**<u>Madden 24</u>**

454.    Madden NFL is an immersive, simulation-based, American football sports video game series.

455.    Madden NFL is available across all major video game systems, including consoles, PC, and mobile devices.

456.    Madden NFL is developed by EA Tiburon for EA Sports, with both companies being controlled and operated by EA.

457.    Madden NFL's staggering popularity and lasting cultural impact makes it one of the most successful video game franchises of all time.

458.    Named after Pro Football Hall of Famer coach and commentor, John Madden, Madden NFL is marketed as "the most realistic digital football experience gaming has to offer." It features detailed playbooks, realistic player animation, and unique player likeness. It is presented

with voice commentary in the style of a real National Football League ("NFL") television broadcast.

459.    Released first in 1988 as *John Madden Football*, the series' name was changed in 1993 to Madden NFL after EA acquired the rights to use NFL teams and players.

460.    Since 2004, Madden NFL has been the only officially licensed NFL video game series available.

461.    New game entries—numbered one year later than the year in which the game is released—are released yearly, typically coinciding with the start of the NFL season in August.

462.    Madden NFL is "a staple to EA Sports." As of 2021, the game has sold over 130 million copies, generating at least $4 billion in total revenue. The series brings EA an estimated revenue exceeding $600 million annually.

463.    While each new Madden NFL entry features a different cover athlete, the game typically includes some version of the same four game modes: Exhibition, Franchise, Superstar (or Face of the Franchise), and Madden Ultimate Team ("MUT").

464.    In Exhibition mode, the player plays a one-off game to its completion.

465.    In Franchise mode, the player manages a team or several teams over many seasons. Franchise mode has been available in Madden NFL since 1998.

466.    In Superstar, the player takes control of a single player and guides this player throughout his career.

467.    Both Franchise and Superstar modes allow for offline and online play.

468.    MUT is an online game mode where the user levels up a custom team with different tiered trading cards of real NFL players, while competing against computer simulated opponents or online MUT players. A MUT "season" tracks with the current NFL season schedule.

469.    MUT players are motivated to obtain higher rated cards to increase the strength of their MUT team, thus increasing their likelihood of success against their MUT opponents.

470.    Players can slowly upgrade their MUT team at no cost by collecting cards or packs (containing multiple player cards or boosts) that are released via promos, events, or in-season tournaments.

471.    But a quicker, instantaneous way players can upgrade their MUT team is by accessing an online marketplace, where cards, packs, and cosmetics can be purchased through either microtransaction currency (via "Madden Points") or by use of in-game coins. The following is a screenshot of Madden Points available on the PlayStation Store:



472.    The MUT online marketplace often features sales and discounts to further encourage the player to purchase items.

473.    The MUT marketplace also features an auction house, where players can use coins to place bids or buy cards that are listed by other MUT players worldwide, or auction off the

player's own cards in exchange for in-game coins. The following is an example screenshot of the auction house from *Madden NFL 23*:



474.     MUT players can build their team and obtain cards or packs through free-to-play options, such as completing solo objectives or by competing in online head-to-head play that help toward redeeming rewards to acquire new cards.

475.     In Madden Rewards, MUT players pack openings are tracked and totaled for additional rewards. In this way, MUT players are encouraged to keep building their team to obtain better rewards. The following is a screenshot of Madden Rewards program: [15]

---

[15] https://www.ea.com/games/madden-nfl

### JOIN MADDEN REWARDS TODAY

**MUT REWARDS IS BACK, BIGGER AND BETTER THAN EVER AS MADDEN REWARDS**

Start earning rewards and unlocking Exclusive In Game Events for opening packs in Madden Ultimate Team. All packs you open will count towards your total and as you progress through Madden Rewards you will earn better content.

Madden Rewards members can receive Coins, Packs, and other great surprises throughout the Madden NFL 23 Season.

**DIGITAL REWARDS NOW AVAILABLE OUTSIDE THE UNITED STATES**

MUT Rewards is open to players both in the US and in countries outside of the US. Only players living in the US are eligible for physical rewards. Players located outside of the US are only eligible for Digital Rewards.

**To Redeem Codes and be eligible for Competitive Madden Tournaments JOIN Madden REWARDS today!**



476.     MUT also uses known addictive technologies, such as its own "battle pass" system, called Field Pass. Field Pass operates in a tiered system, where "the more time invested and the more challenges completed in the game, the more rewards the player will be able to unlock."

477.     Challenges in Field Pass have specific goals that need to be completed (e.g. scoring rushing touchdowns from certain distances). These challenges are scaled—the higher the difficulty level, the better the reward—incentivizing the player to continue playing.

478.     MUT players can play against each other to gain additional rewards based on how many games the player won against other people online.

479.     For *Madden NFL 24*, cross system play is available for the first time, meaning users can play against each other across PlayStation 5, Xbox Series X, Xbox Series S, and PC.

480.     The Madden NFL Defendants know that all of these features in their games work together to addict users and further abuse and compulsively use the games.

481.     The Madden NFL Defendants specifically developed their games along with psychologists and neuroscientists to include such addictive psychological traits.

482.     By encouraging users to keep playing the game and build habits around it, the Madden NFL Defendants know that players are more likely to spend real-world funds within the game.

483.    At the expense of users' mental and physical well-being, the Madden NFL Defendants fail to inform the public, users, or parents that the game was designed to addict and harm users or of the inherent risks or negative consequences that can arise from playing their game.

484.    The Madden NFL Defendants intend to introduce and addict as many users as possible in order to increase their own profits as these users continue playing—and spending.

485.    Though the Madden NFL Defendants know of the addictive features and technology included in the Madden NFL games, such as those features and technologies described herein, they do not inform their users of the risks inherent with playing this game.

486.    The Madden NFL Defendants do not adequately inform users of the inherent risks involved with using and playing Madden NFL, or that the game was designed to addict and harm users.

**Sony PlayStation and PlayStation Network: PlayStation 4, PlayStation 5, and PlayStation Essentials**

487.    PlayStation is a video gaming brand, owned and operated by Sony, that consists of PlayStation gaming consoles and handhelds, as well as video games and online video gaming through the PlayStation Network and PlayStation Plus.

488.    Sony designs, develops, manufactures, produces, supplies, and sells PlayStation video game consoles—and markets all Sony video game products—to the consumers across the world, and specifically in Ohio and to Plaintiffs.

489.    Sony has manufactured and released six versions of its PlayStation consoles: PlayStation, PS one, PlayStation 2, PlayStation 3, PlayStation 4, and PlayStation 5.

490.    Sony released the original PlayStation in North America in 1995.

491.    Sony designed and developed PlayStation as part of a partnership or joint venture with Nintendo, with the key design feature being a built-in CD-Rom drive to increase load speeds and provide better graphics, along with other technologies, for more engaging video game play.

492.    Sony released a redesigned version of the original PlayStation, PS one, in 2000, with the primary redesign being the home menu's Graphical User Interface.

493.    Concurrently with the release of PS one, Sony released PlayStation 2 ("PS2").

494.    Sony designed PS2 to be backwards-compatible with most original PlayStation games.

495.    PS2 was designed to allow users to play select video games online, using a third-party server, using an add-on network adaptor sold by Sony for use with the PS2.

496.    In 2004, Sony released a redesigned PS2 Slimline—the first PlayStation console to include a built-in Ethernet port to allow users to play select video games online without need for a separate adaptor.

497.    In 2005, Sony announced their intent to create and build their own PlayStation server so that its product users could constantly be in touch with the PlayStation World.

498.    Sony launched its PlayStation Network in March of 2006.

499.    Sony released PlayStation 3 ("PS3") in North America in November of 2006, featuring redesigns of the hardware and software components including but not limited to the introduction of motion-sensing technology through its wireless controller, a Blu-Ray Disc player, and high-definition resolution.

500.    In marketing PS3 to consumers, Sony used the tagline "Never Stop Playing."

501.    Sony released its PlayStation 4 ("PS4") in North America in November 2013.

502.    Sony marketed PS4 as "pushing the boundaries of Play."

503.    PS4 is not compatible with any video game discs used with older PlayStation consoles, such that PS4 users must purchase new games in order to use PS4.

504.    Sony, and its partner video game designers and developers, distribute and sell PS4 games at retail stores on Blue-Ray Disc, and digitally as downloads through the PlayStation Store.

505.    All PS4 games must be installed to the console's storage.

506.    PS4 has a built-in "PlayGo" feature that allows users to begin to play portions of a game (such as opening levels) once the installation or download reaches a specific point, while the remainder of the game is downloaded or installed in the background.

507.    When a user has connected their PS4 to the internet, Sony and its partner game designers and developers automatically update games and system software in the background while the console is on standby.

508.    PS4 gaming consoles feature Wi-Fi and Ethernet connectivity, Bluetooth, and other built-in technologies that make game play more interactive and immersive.

509.    In designing and developing the PS4, Sony focused on social interaction capabilities and integration with other devices and video game products, including the ability to play games off-console on PlayStation Vita (a handheld game console) and other supported devices through (known as "Remote Play"), and the ability to stream gameplay online or to friends with them controlling game play remotely (known as "Share Play").

510.    PS4 is designed to allow users to not only play video games with and against one another, but also includes a live streaming feature.

511.    Live streaming allows users to watch live gameplay of other users through the PS4 interface with cross-game camera and microphone input, to spectate silently (i.e., without camera or voice input), or to broadcast their own gameplay live via DailyMotion, Twitch, Ustream,

Niconico, or YouTube Gaming, during which friends or members of the public can view and comment upon the user's game play from any device.

512.    In releasing PS4, Sony also redesigned the game controller to make it easier for users to utilize these features and engage in social gameplay.

513.    In designing PS4, Sony used technology similar to personal computers to make it easier and less expensive for game studios, including its own, to develop video games for PS4.

514.    Sony sells and markets add-on video game products for use with PS4, including PlayStation VR and PlayStation Camera, as a means for consumers to further utilize the built-in social gaming features and to enhance their video gaming experience.

515.    Sony also released the PlayStation App in conjunction with the PS4, which allows PS4 owners to turn a smartphone or tablet into a second screen to enhance gameplay.

516.    In 2015, Sony released PlayStation Now, a cloud-based video game distribution product that allows users to purchase PS3 games (individually or by subscription) for play on the PS4.

517.    Sony released its PlayStation 5 ("PS5") worldwide on November 12, 2020.

518.    PS5 was designed to provide users with fast loading times and a larger bandwidth to make games more immersive and to support all features (including microtransaction) built into video games.

519.    PS5 was also designed with a completely new user interface, but is backwards compatible with most PS4 and PlayStation VR games.

520.    PS5's main hardware features include a solid-state drive, customized for high-speed data streaming to enable significant improvements in storage performance, an AMD GPU capable of 4K resolution display, hardware-accelerated ray tracing for realistic lighting and reflections, the

Tempest Engine for hardware-accelerated 3D audio effects, a DualSense controller with haptic feedback, and other upgraded features that make game play more interactive and immersive.

521.    PS5 is available in two models: a base version with an Ultra HD Blu-Ray compatible optical disc drive for retail game support alongside online distribution via the PlayStation Store, and a lower-cost variant lacking the disc drive and retaining digital download support.

522.    Like PS4, users are required to install all video games on the PS5 console in order to play the game.

523.    In marketing PS5 and its features, including the DualSense controller, Sony told consumers "you need new devices to experience what these developers want you to experience."

524.    For use with its PlayStation consoles and games, Sony designed, developed, and maintains the PlayStation Network.

525.    PlayStation Network allows users to participate in online multiplayer gaming and to purchase video games and other video game products through the PlayStation Store.

526.    Sony developed and maintains the PlayStation Store—a product through which users can purchase and download thousands of games:



527.     Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of Duty Modern Warfare 3, and Madden 24 are available through the PlayStation Store.

528.     Once a game is downloaded, Sony provides a framework to initiate and process in-game purchases and microtransactions through the PlayStation Store.

529.     This framework enables game developers to sell microtransactions and/or loot boxes through the PlayStation Network.

530.     In exchange, Sony keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

531.     Another product Sony makes available on its PlayStation Network is PlayStation Plus ("PS Plus"), a paid tiered subscription service offered by Sony that provides users access to online multiplayer games.

532.     PlayStation Plus offers three membership plans, each with different features and costs.

---

[16] https://store.playstation.com/en-us/pages/browse

533.    The "Essential" tier offers users monthly downloads of PlayStation games as well as the ability to play online multiplayer games, for $9.99 per month.

534.    The "Extra" tier offers the same features as the Essential tier, but with access to the PlayStation Game Catalog of hundreds of games.

535.    Finally, the "Premium" tier provides the same features as the Essential and Extra tiers, but also provides access to the Classics Catalog and cloud streaming.

536.    PlayStation cloud streaming allows users to stream and play hundreds of PS5, PS4, and classic PlayStation games from any PS5 or PS4 console or computer.

537.    Through PlayStation cloud streaming, downloadable video game products, and in-game purchases are available for streaming—meaning that purchased products will be available on every device on which a user logs in to play.

538.    PlayStation Plus cloud gaming operates by linking the devices to a remote server in the cloud.

539.    Gameplay is saved in the cloud and can be accessed and picked up at the same spot from numerous devices in any given location.

540.    As of March 2023, PlayStation Plus had over 47 million subscribers.

541.    These subscribers are able to connect, add each other as friends, and chat through the PlayStation Network.

542.    This social media-esque feature permits users to add friends to a Friends list and then see what games your friends are playing and/or invite them to join your game.

543.    Minors and young adults are therefore encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games.

544.     Sony's latest tagline—"Play Has No Limits"—encourages users across the world, no matter their circumstances, to engage in limitless video game play.



545.     Sony intentionally designed its video game products, described above, to attract users to purchase and play video games—regardless of the content or subject matter such games may include.

546.     Upon information and belief, Sony hires behavioral psychologists and neuroscientists to design its consoles, games, products, and marketing in such a way to attract users, especially minors and young adults, and to keep them playing.

547.     Sony is aware that its video game products and the games playable thereon, that it sells and encourages users to continually purchase in-game product upgrades and microtransactions are addictive and pose unreasonable risk of harm to users, particularly minors.

---

[17] https://www.youtube.com/watch?v=cAEs3hI1f2w

548.    Sony does not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon—were designed to addict and harm users.

**M. D.F.'s Access to Defendants' Products**

549.    D.F.—as a minor—lacked the capacity to contract, and thus expressly disaffirms any contract D.F. may have made with any of the Defendants, or that Defendants may claim D.F. made with them before reaching the age of majority.

550.    D.F.'s continued use of Defendants' products was thereafter compulsive and due to addiction and in no way was an affirmation of any contract.

551.    Each Defendant's terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to signing between the parties. Accordingly, any terms to which Plaintiffs agreed prior to utilizing each Defendant's product, or while using such product, are void and unenforceable.

552.    Defendants' products were designed to addict D.F. to the products, which proximately caused D.F.'s mental and physical health issues; therefore, Defendants' terms and conditions and any other purported contracts are void as against public policy as an individual cannot consent to harming a child.

## V.    TOLLING OF STATUTE OF LIMITATIONS

553.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

554.    Through the exercise of reasonable diligence, Plaintiffs could not have discovered that Defendants' products caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiffs.

555.    Plaintiffs did not suspect and had no reason to suspect Defendants' products caused their injuries until within the last year. Due to the highly technical nature of the Defendants' products, Plaintiffs were unable to independently discover that Defendants' products caused their injuries until within the last year.

556.    Defendants had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

557.    Defendants' fraudulent concealment tolled the running of any statute of limitations.

558.    Defendants had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially children and teens.

559.    Defendants knowingly, affirmatively, and actively concealed from Plaintiffs the risks associated with the defects of their products and that these products caused their injuries.

560.    Defendants' tortious and fraudulent acts continue to this day; as of the date of this Complaint, Defendants have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their products.

561.    Despite their knowledge of the defects and their attendant safety risks, Defendants continue to market their products to children and teens—and even their educators—while simultaneously omitting the disclosure of known and foreseeable harms.

562.    D.F. was unaware and could not have reasonably known or learned through reasonable diligence that D.F. had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

563.     Sonya Foster was unaware and could not have reasonably known or learned through reasonable diligence that D.F. had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

564.     For the foregoing reasons, Defendants are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' active concealment with respect to all claims against Defendants.

## VI.     CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY – DESIGN DEFECT (OPLA SECTION 2307.75)
### (Against All Defendants)

565.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

566.     At all relevant times, each Defendants were engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by D.F.: Fortnite, Roblox, Call of Duty, Grand Theft Auto, PS4, PS5, PlayStation Store, PlayStation Essentials, and Madden.

567.     Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

568.     Each of the Defendant's respective products are marketed and advertised to minors and young adults.

569.     Each Defendant defectively designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harm from those products. More specifically:

a. Epic Games designed Fortnite to be as addictive as possible and with psychologically addictive features and tricks to ensnare game players, including but not limited to, designing the game to include a "near miss" effect, loot boxes, random rewards, bright and vibrant colors, and continual gameplay variety;

b. Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

c. The Call of Duty Defendants designed the Call of Duty games with psychologically addictive features, including but not limited to feedback loops, fast-paced play, and dopamine lifts from satisfying graphics and sounds;

d. The GTA Defendants designed the Grand Theft Auto games with psychologically addictive features, including but not limited to endless activities, exciting in-game products and prizes for players to earn, and daily objectives;

e. Rocket League Defendants designed Rocket League with psychologically addictive features, including but not limited to continuous mutator updates, varied gameplay, and offering daily items in the Item Shop;

f. Madden NFL Defendants designed Madden NFL with psychologically addictive features, including but not limited to endless activities in MUT; exciting in-game products and prizes for players to earn, and daily objectives; and

      g.   Sony designed its PlayStation consoles (including PlayStation 4 and PlayStation 5) with addictive features and for use with addictive video game products, and designed its PlayStation Network, including PlayStation Essentials, with addictive features to be used with its PlayStation consoles and to house, purchase, and use addictive video game products, to take advantage of the chemical reward system of users' brains, and these addictive features include but are not limited to engaging graphics, social aspects, and rotating game libraries.

570.    The defects in the design of each of the Defendant's respective products existed prior to the release of these products to D.F. and the public, and there was no substantial change to any of the Defendants' products between the time of their manufacture (in regard to consoles or physical game copies) and the time of their distribution to D.F. via download or URL access (in regard to digital game copies and cloud gaming).

571.    D.F. used these products as intended, and each Defendant knew or, by the exercise of reasonable care, should have known that Plaintiffs would use these products without inspection for their addictive nature.

572.    Each Defendant defectively designed its respective products to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, compulsive use, and additional mental and physical harm. More specifically:

      a.   Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

b.  Roblox Corporation designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

c.  The Call of Duty Defendants designed the Call of Duty games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

d.  The GTA Defendants designed Grand Theft Auto in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals;

e.  The Rocket League Defendants designed Rocket League in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

f.  Madden NFL Defendants designed Madden NFL in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals; and

g.  Sony designed its PlayStation consoles (including PlayStation 4 and PlayStation 5) its PlayStation Network, including PlayStation Essentials, in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure that minors and young adult users continually use its video game products and continually purchase addictive video game products for play on PlayStation consoles.

573.  Each of the Defendant's respective products are defective in design and unreasonably dangerous for the reasons set forth herein, because the products fail to meet the safety

expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

574.    Youth, including D.F., and young adults are among the ordinary consumers of each of the Defendant's products.

575.    Minors and young adult consumers, and their parents and guardians, do not expect: (a) Defendants' products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its respective products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each of the Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable content and/or microtransactions.

576.    Each of the Defendant's respective products are likewise defectively designed such that it creates an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

577.    Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control. The defects continued to exist through the products' distribution to and use by consumers, including D.F., who used the products without any substantial change in the products' condition.

578.    The risks inherent in the design of each of the Defendant's respective products significantly outweigh any benefit of such design.

579.    Each of the Defendants could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

     a.   Choosing not to use "addictive" patents identified herein in the game design;

     b.   Redesigning gaming software to limit rather than promote addictive engagement;

     c.   Implementing robust age verification;

     d.   Implementing effective parental controls;

     e.   Implementing effective parental notifications;

     f.   Warning of health effects of use and extended use upon sign-up or log-in;

     g.   Implementing default protective limits to the length and frequency of gaming sessions;

     h.   Implementing opt-in restrictions to the length and frequency of gaming sessions;

     i.   Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports;

     j.   Implementing blocks to use during certain times of day (such as during school hours or late at night);

     k.   Implementing limits on number of games playable per day;

     l.   Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer;

m. Implementing limits on minors' in-game purchases, downloadable content, microtransactions, and total in-game spending per day;

n. Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and

o. Other alternatives as set forth herein.

580. Alternative designs were available that would reduce minors' addictive and compulsive engagement with each of the Defendant's respective products, and which would have effectively served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

581. D.F. used Defendants' products as intended or in reasonably foreseeable ways.

582. As a direct and proximate result of their use of Defendants' defectively designed products, D.F. sustained physical injuries, mental harm, emotional distress, pain and suffering, mental anguish, and economic injuries and damages.

583. D.F.'s injuries and damages were reasonably foreseeable to each of the Defendants at the time of their respective products' development, design, advertising, marketing, promotion, and distribution, especially considering each of the Defendant's conduct—described herein—of specifically designing their respective products to be addictive.

584. The defective design of the products used by D.F. was a substantial factor in causing harm to D.F.

585. As a direct and proximate result of Defendants' respective products' defective design, D.F. suffered serious injuries, including physical injury, diminished social interactions, a

lack of interest in other sports/hobbies, a loss and/or lack of friends at school, and withdrawal symptoms such as rage, anger, and physical outbursts.

586.    D.F. was injured as a direct and proximate result of each of the Defendant's respective defective designs, as described herein, and Plaintiffs suffered economic damages as a result thereof.

587.    The defective design of Defendants' respective products, as identified and described herein, is a proximate cause of the harm and injuries to D.F.

588.    Plaintiffs' damages that were proximately caused by Defendants' defective design are D.F.'s mental harm (and the permanency thereof); pain and suffering; mental anguish; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to D.F.'s injuries. D.F.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

589.    Defendants are strictly liable due to the defective design of their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

590.    The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

591.    The nature of the intentional and fraudulent acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, D.F. continues to use Defendants' respective products. While D.F. uses Defendants' respective products, Plaintiffs will not be able to independently verify whether Defendants' respective products

continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

592. The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including D.F., and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

**COUNT II**
**STRICT LIABILITY - FAILURE TO WARN (OPLA SECTION 2307.76)**
**(Against All Defendants)**

593. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

594. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the videogame products used by D.F.: Fortnite, Roblox, Call of Duty, Grand Theft Auto, PS4, PS5, PlayStation Store, PlayStation Essentials, and Madden.

595. Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

596. Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

597.    None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

598.    Each of the Defendants sold and distributed its respective products to D.F. in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth as described herein, including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

599.    Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they encourage unhealthy, addictive engagement, and compulsive use.

600.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution and their respective propensities for abuse, addiction, and compulsive use by youth which can lead to a cascade of harms.

601.    Defendants' respective products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

a.    Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries;

b.   Defendants' respective products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries;

c.   The feedback loops and strategized patented material in Defendants' respective products are designed to promote increasingly stimulative and alarming content to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction;

d.   New users of Defendants' respective products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians;

e.   The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and

f.   The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

602.    Ordinary users would not have recognized the potential risks of Defendants' respective products when used in a manner reasonably foreseeable to each of the Defendants.

603.    Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using Defendants' respective products, Plaintiffs would have heeded the warnings and/or instructions.

604.    Each Defendant's failure to adequately warn Plaintiffs about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

605.    As a direct and proximate result of each Defendant's failure to warn, D.F. has required and will require more healthcare and services and did incur medical, health, related expenses incidental to D.F.'s addiction and mental disability, as described herein.

606.    Defendants are strictly liable due to each Defendant's failure to warn of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

607.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including D.F., and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT III
## FRAUDULENT MISREPRESENTATION (OPLA SECTION 2307.77)
### (Against All Defendants)

608.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

609.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video

game products used by D.F.: Fortnite, Roblox, Call of Duty, Grand Theft Auto, PS4, PS5, PlayStation Store, PlayStation Essentials, and Madden.

610. As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users. Each Defendant made representations of material facts about their respective products, while knowing or believing those representations to be false and with the intent that Plaintiffs (and the public) rely on those misrepresentations.

611. These false representations involve misstatements about the safety of each Defendant's product identified herein and include, but are not limited to:

    a.   Epic Games misrepresented Fortnite as educational and safe for use by minors, young adults, and neurodivergent individuals, including D.F., while knowing that abuse, addiction, and compulsive use by such product users can lead to brain damage and injury, and knowing that it had designed and developed Fortnite to be as addictive as possible;

    b.   Roblox Corp. misrepresented the Roblox games as safe for use by minors, young adults and neurodivergent individuals, while knowing they had been designed and developed with addictive psychological features to keep users playing Roblox more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that Roblox poses significant risk of harm to users;

    c.   The COD Defendants misrepresented the Call of Duty games as safe for extended, long-term play while knowing that abuse, addiction, and compulsive use by foreseeable users like youth and neurodivergent people can lead to

injury, and knowing that they had designed and developed the Call of Duty games to be as addictive as possible;

d. The GTA Defendants misrepresented Grand Theft Auto as safe for extended, long-term play and for use by minors, young adults, and neurodivergent individuals, including D.F., while knowing that abuse, addiction, and compulsive use by such users can lead to brain damage and other injury, and knowing that it had designed and developed the Grand Theft Auto series to be as addictive as possible;

e. The Rocket League Defendants misrepresented Rocket League as safe for use by minors and neurodivergent individuals, including D.F., while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, and knowing that it had designed and developed Rocket League to be as addictive as possible;

f. Madden NFL Defendants misrepresented Madden NFL as safe for use by minors and neurodivergent individuals, including D.F., while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, and knowing that it had designed and developed Madden NFL to be as addictive as possible; and

g. Sony misrepresented that its PlayStation consoles and PlayStation Network, including PlayStation 4, PlayStation 5, and PlayStation Essentials were safe for use by all, including minors, young adults, and neurodivergent individuals, while knowing that these products were designed and developed with addictive features to keep users using Sony's video game products, playing video games,

and purchasing addictive video game products, and while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury, such that its products pose significant risk of harm to users, like D.F.

612. Defendant knew their games posed risk to minors, including D.F., based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, including D.F., to purchase/download the game and to continue using Defendants' products to the addiction knowingly caused by Defendants' products.

613. Each Defendant also knowingly and recklessly misled the public—particularly product users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use. These misrepresentations of material fact include, but are not limited to:

    a. Epic Games marketed Fortnite as educational and safe for use by minors, young adults, and neurodivergent individuals (in and outside the classroom), despite knowing that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by such users leading to brain damage and other damages that arise therefrom, and that have been experienced by D.F.;

    b. Roblox Corp. marketed Roblox as safe for all ages and as an educational tool without warning of the addictive design and risk of injury associated with its video game product and foreseeable use thereof, despite knowing that Roblox contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by D.F.;

c. The COD Defendants marketed their Call of Duty games without warning of the addictive design and risk of injury associated with the products, despite knowing that the Call of Duty games contained an inherent risk of abuse, addiction, and compulsive use by foreseeable users, including minors and neurodivergent individuals, and the harms that arise therefrom, and that have been experienced by D.F.;

d. The GTA Defendants marketed their Grand Theft Auto video game products as safe for use by youth and young adults and without warning of the addictive design and risk of injury associated with the products, despite knowing that use of Grand Theft Auto contained an inherent risk of brain damage, injury, abuse, addiction, and compulsive use by foreseeable users, such as youth, young adults, and neurodivergent people—harms that arise from playing Grand Theft Auto and that have been experienced by D.F.;

e. The Rocket League Defendants marketed Rocket League for play by youth and directed their misstatements to youth despite knowing that the Rocket League contained an inherent risk of brain damage, abuse, addiction, and compulsive use by youth and neurodivergent people, and the harms that arise therefrom and that have been experienced by D.F.;

f. Madden NFL Defendants marketed Madden NFL as for play by such foreseeable users despite knowing that Madden NFL contained an inherent risk of brain damage, abuse, addiction, and compulsive use by youth and neurodivergent people, and the harms that arise therefrom and that have been experienced by D.F.; and

g.  Sony knew that its PlayStation consoles, PlayStation Network, PlayStation Store and PlayStation Plus products, as well Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of duty Modern Warfare 3, and Madden 24 contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals, and the harms that arise therefrom, but intentionally marketed its products for use by such individuals and directed its misstatements towards users of Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of duty Modern Warfare 3, and Madden 24, and other games designed, developed and utilizing the patents and technology described herein.

614.  By intentionally making numerous material misrepresentation, including, but not limited to, downplaying any potential harm associated with its respective products, and affirmative representations to the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

615.  Each Defendant knew that its misstatements and false representations, as identified herein, were material.

616.  Each Defendant knew that its misstatements and false representations, as identified herein, were false.

617.  The misrepresentations described herein were made to Plaintiffs—particularly to D.F.—prior to their purchase of each Defendant's product and to D.F. while D.F. was using Defendants' products as intended.

618.   Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

619.   D.F. and D.F.'s parent, Sonya Foster, relied on Defendants' material misstatements and false representations in deciding whether to use, or continue to use, each of Defendants' products; specifically, Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of Duty Modern Warfare 3, and Madden 24.

620.   Plaintiffs' reliance on the material misrepresentations of each Defendant when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game transactions in each Defendant's product was justifiable.

621.   As a direct and proximate result of the material misrepresentations and false statements of each Defendant, i.e., Defendants' deceit, Plaintiffs were not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiffs justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

622.   As a direct and proximate result of each of the Defendant's material misrepresentations and false statements, i.e., Defendants' deceit, Plaintiffs have been damaged. Such damage includes D.F.'s mental harm (and the permanency thereof); pain and suffering; mental anguish; D.F.'s inability to attend school; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to D.F.'s mental harm. Further, D.F.'s injuries

are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

623.    Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

624.    Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, including Plaintiffs, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT IV
## FRAUDULENT INDUCEMENT (OPLA SECTION 2307.77)
### (Against All Defendants)

625.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

626.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by D.F.: Fortnite, Roblox, Call of Duty, Grand Theft Auto, PS4, PS5, PlayStation Store, and PlayStation Essentials.

627.    Within these products, each Defendant included the ability for users, including Plaintiffs, to purchase in-game downloadable content or microtransactions. Users of Defendants' products, including minors such as D.F., were induced into microtransactions by each Defendant to make such purchases through false representations and material misstatements built into each

of the Defendants' products. Defendants' methods of fraudulent inducement include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to advance, AI avatars or "friends" to encourage purchase, and disguised features of the Defendants' products, which misrepresent to users, like Plaintiff, that game-selected purchases would help them advance in the game or complete necessary missions.

628.    Defendants made these false representations and material nondisclosures with intent to induce D.F. into the microtransaction.

629.    At the time each Defendant utilized these technologies to induce D.F. to make in-game purchases, each Defendant knew that the representations made through the game were false and existed only to entice D.F. to continue spending.

630.    Each Defendant intended its fraudulent in-game content to induce D.F. to continue purchasing in-game downloadable content and/or in-game transactions within its respective product.

631.    At the same time, each Defendant knew that the inducements to make additional in-game purchases served only to increase the inherent risk of danger to users, including D.F., specifically a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

632.    D.F. reasonably relied on the enticements within each Defendant's product to make several in-game purchases that actually had little to no value to D.F. within the game.

633. Had D.F. known that the representations in each Defendant's respective products regarding in-game purchases were false and fraudulent, D.F. never would have agreed to purchase in-game downloadable content or microtransactions.

634. Furthermore, as detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users, including D.F.

635. Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly concealed those findings, in order to avoid losing revenue, and to induce D.F. to continue using each Defendant's respective products.

636. In conjunction with Defendants' acts of concealment, each Defendant knowingly and recklessly misled the public, users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use.

637. Each Defendant intended its concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

638. By intentionally making numerous material misrepresentations, downplaying any potential harm associated with its respective products, and reassuring the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant did fraudulently induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

639.    As a direct and proximate cause of each of the Defendant's deceptive and fraudulent conduct, D.F. is addicted to Defendants' respective products and is unable to refrain from gameplay or in-game purchases.

640.    D.F. was induced into microtransactions that resulted in D.F. spending thousands of dollars on in-game purchases or microtransactions.

641.    Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, including D.F., would be induced into spending money that they would not spend on Defendants' products if they knew the truth.

642.    A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products. Plaintiffs justifiably relied on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game transactions in each Defendant's product.

643.    As a direct and proximate result of each Defendant's fraudulent inducement, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's respective products, and/or purchasing downloadable game content or in-game transactions in each Defendant's product.

644.    As a direct and proximate result of each of the Defendant's concealment of material information, Plaintiffs have been financially and otherwise harmed through each of the

Defendant's inducements to utilize their platforms, download and play their games, and/or continuously spend funds through its products.

645.     As a direct and proximate result of each Defendant's fraudulent inducement, Plaintiffs have been damaged. Specifically, each Defendant engaged in deceitful conduct through its fraudulent omissions to parents that minors gaming behavior is collected and tracked and nondisclosure of the risk of gaming addiction, and that deceitful conduct is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, harm, and damages described herein.

646.     Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, including Plaintiffs, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT V
## NEGLIGENCE – DESIGN
### (Against All Defendants)

647.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

648.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by D.F.: Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of Duty Modern Warfare 3, Madden 24, PlayStation 4, and PlayStation 5.

649.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

650.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

651.    Each Defendant knew or, by the exercise of reasonable care, should have known, that its respective products were dangerous, harmful, and injurious when used by youth in a reasonably foreseeable manner. More specifically:

    a.  The GTA Defendants designed Grand Theft Auto to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    b.  The Rocket League Defendants designed Rocket League to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    c.  Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain, while knowing that abuse, addiction, and compulsive use

by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e. The COD Defendants designed the Call of Duty games to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f. Madden NFL Defendants designed Madden NFL to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal

symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

g. Sony designed its PlayStation consoles (including PlayStation 4 and PlayStation 5) with addictive features and for use with addictive video game products, designed its PlayStation Network, including PlayStation Essentials, with addictive features to be used with its PlayStation consoles and to house, purchase, and use addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

652.     Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to D.F., especially considering each of the Defendant's conduct—described herein—of specifically designing their respective products to be addictive.

653.     Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' respective products. Those risks include abuse, addiction, and compulsive use in youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on

cognitive processes, and other harmful effects. Despite this knowledge, each Defendant failed to warn users, including D.F., of their respective product's dangerous propensity.

654.    Each Defendant knew that minors such as D.F. would use its respective products.

655.    D.F. was a foreseeable user of each of the Defendant's respective products.

656.    Each Defendant had a non-delegable duty to design reasonably safe products.

657.    Each Defendant owed this duty to users including D.F.

658.    Each Defendant breached this duty. These breaches include, but are not limited to:

    a.    Utilizing patented designs and technology for purposes of addicting users to the Defendant's respective products;

    b.    Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to youth, who are particularly unable to appreciate the risks posed by the products;

    c.    Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

    d.    Failing to use ordinary care in the design of its products by negligently designing its products with features and patented technology as described above that created or increased the risk of brain damage, abuse and addiction in youth, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    e.    Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features

described above, and other safety measures, to minimize the harms described herein; and

f.   Otherwise failing to use ordinary care in its design.

659.    Alternative designs that would reduce the addictive features of each of the Defendant's respective products were available, would have effectively served the same purpose as each of the Defendant's defectively designed products, and would have reduced the gravity and severity of danger each of the Defendant's respective products posed minors such as Plaintiff.

660.    A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

661.    At all relevant times, D.F. used each of the Defendant's respective products in the manner in which they were intended by Defendants to be used.

662.    As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs were harmed.

663.    Defendants' design of their respective products was a substantial factor in causing the Plaintiffs' harm and injuries, as described herein.

664.    As a direct and proximate result of each of the Defendant's breached duties, D.F. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses related to the D.F.'s gaming addiction, physical injuries, mental health diagnoses, emotional distress, pain, suffering, and mental anguish proximately caused by the negligent design of each Defendant's product.

665.    As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs have suffered—and continued to suffer—economic loss and pecuniary damages, as described herein, related to the D.F.'s gaming addiction, physical injuries, mental health diagnoses,

emotional distress, pain, suffering, and mental anguish proximately caused by the negligent design of each Defendant's product.

666.    Defendants negligently designed their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.]

**COUNT VI**
**NEGLIGENCE – FAILURE TO WARN**
**(Against All Defendants)**

667.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

668.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by D.F.: Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of Duty Modern Warfare 3, Madden 24, PlayStation 4, and PlayStation 5.

669.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

670.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

671.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner. More specifically:

a.    The GTA Defendants designed Grand Theft Auto to take advantage of the chemical reward system of a user's brain to create addictive engagement, while

115

knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b.  The Rocket League Defendants designed Rocket League to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.  Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain in order to create addictive engagement, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.  Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative

116

behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.  The COD Defendants designed the Call of Duty games to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.  Madden NFL Defendants designed Madden NFL to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

g.  Sony designed its PlayStation consoles (including PlayStation 4 and PlayStation 5) with addictive features and for use with addictive video game products, designed its PlayStation Network, including PlayStation Essentials, with addictive features to be used with its PlayStation consoles and to house, purchase, and use addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior,

117

withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

672.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to D.F., especially considering each of the Defendant's conduct—described herein—of specifically designing their respective products to be addictive.

673.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as D.F. would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

674.    Each Defendant knew that minors such as D.F. would use its respective products.

675.    None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

676.    Had Plaintiffs received proper or adequate warnings about the risks of Defendants' products, Plaintiffs would have heeded such warnings.

677.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

118

678.    Each Defendant owed this duty to users including D.F.

679.    Each Defendant breached this duty owed to D.F., a foreseeable user. These breaches include, but are not limited to:

a.    Failing to warn users that Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries; and

b.    Failing to otherwise provide reasonable and adequate warnings to Plaintiffs, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of each Defendant's product.

680.    A reasonable company under the same or similar circumstances as Defendants would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

681.    At all relevant times, each Defendant could have provided adequate warnings to prevent the harm and injuries described herein.

682.    Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, D.F. and D.F.'s parent would have heeded such warnings.

683.    As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Plaintiffs were harmed and sustained the injuries set forth herein.

684.    Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiffs.

685.    Each Defendant negligently failed to warn consumers, including Plaintiffs, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and

Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

**COUNT VII**
**NEGLIGENCE – FAILURE TO INSTRUCT**
**(Against All Defendants)**

686.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

687.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by D.F.: Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of Duty Modern Warfare 3, Madden 24, PlayStation 4, and PlayStation 5.

688.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

689.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

690.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

a.  The GTA Defendants designed Grand Theft Auto with addictive features to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms,

social isolation, negative consequences on cognitive processes, and other harmful effects;

b.  The Rocket League Defendants designed Rocket League to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.  Epic Games designed Fortnite to take advantage of the chemical reward system of a product user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.  Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.  The COD Defendants designed the Call of Duty games with addictive features to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.  Madden NFL Defendants designed Madden NFL to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

g.  Sony designed its PlayStation consoles (including PlayStation 4 and PlayStation 5) with addictive features and for use with addictive video game products, designed its PlayStation Network, including PlayStation Essentials, with addictive features to be used with its PlayStation consoles and to house, purchase, and use addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

122

691.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to D.F.

692.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

693.    Each Defendant had a duty to give reasonable and adequate instructions with respect to the conditions and methods of its safe use when danger is reasonably foreseeable in its use unless the danger is known to the user or is reasonably discoverable by them.

694.    Each Defendant breached its duty by failing to provide reasonable and adequate instructions to D.F., a foreseeable user. More specifically, Defendants did not give any instructions with respect to the addictive conditions of their respective products or on methods of its safe use to avoid the risks and harms built into each Defendants' respective gaming products.

695.    A reasonable company under the same or similar circumstances as Defendants would have used provided adequate instructions to consumers, including minor users and parents like Plaintiffs.

696.    At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

697.    Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, D.F. and D.F.'s parent would have followed such instructions.

698.    As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate instructions, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient instructions was a substantial factor in causing harm to Plaintiffs.

699.    As a direct and proximate result of each Defendant's failure to instruct, D.F. has required—and will require more—healthcare and services, along with incurring—and continuing to incur—medical, health, incidental, and related expenses.

700.    Plaintiffs have also incurred economic losses, including thousands of dollars spent by D.F. while using Defendants' products, that they would not have incurred but for the addictive and harmful propensities of Defendants' gaming products.

701.    Each Defendant negligently failed to instruct consumers, including Plaintiffs, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

**COUNT VIII**
**NEGLIGENCE PER SE**
**(Against All Defendants)**

702.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

703.    The United States Congress has enacted the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, to protect minors who use the Internet.

704.    Federal regulations, specifically 16 C.F.R. § 312 *et seq.*, have been put in place to effectuate COPPA's purposes and which establish certain obligations for operators of websites and online services that are intended to inform parents and guardians about the collection of their children's personal information.

705.    COPPA requires operators of online services and websites directed to children under 13 to notify parents about the personal information they collect and to obtain verifiable parental consent before collecting and using any personal information collected from children. 16 C.F.R. § 312.4(a).

706.    The parental notice required by COPPA "must be clearly and understandably written, complete, and must contain no unrelated, confusing, or contradictory materials." 16 C.F.R. § 312.4(a).

707.    COPPA requires operators to make reasonable efforts to ensure that a parent of a child receives direct notice of the operator's practices with regard to the collection, use, or disclosure of personal information from children before collecting personal information from children. 16 C.F.R. § 312.4(b).

708.    COPPA requires operators of online services and websites to collect a child's telephone number, as opposed to online contact information, without first obtaining verifiable parental consent. 16 C.F.R. § 312.5(c)(1) and (6).

709.    COPPA requires operators to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that each Defendant collects personal information from children. 16 C.F.R. § 312.4(d).

710.    A violation of COPPA, including the regulations enacted to enforce that law, constitutes an unfair or deceptive act or practice in or affecting commerce. *See* 15 U.S.C. § 6502(c); 15 U.S.C. § 45(a)(1).

711.    Avatars generated from a child's image, and biometric and health information, are covered by COPPA when collected with other personal data.

712.    Each Defendant is an "operator" as defined by 16 C.F.R. § 312.2 and, therefore, subject to the laws and regulations established by COPPA.

713.    Each of the Defendants collects or uses personal information from children under the age of 13—including D.F.—through its respective products that are directed to (or that each Defendant has actual knowledge were used by) children.

714.    Each Defendant has actual knowledge that it collects personal information directly from users of its respective websites or online services.

715.    Each Defendant has collected or used personal information from children younger than age 13 in violation of COPPA by, at least:

716.    Failing to provide through their respective websites and apps a clear, understandable, and complete direct notice to parents that described each Defendant's respective practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R. § 312.4(a) and (c);

717.    Failing to make reasonable efforts, taking into account available technology, to ensure parents received such notice on their websites and applications so that parents could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c); and

718.    Failing to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1).

719.    The GTA Defendants, in connection with Grand Theft Auto, violated COPPA and those violations include, but are not limited to:

      a.   Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses; IP addresses, web and app browsing activity, device usage, profile inferences, and precise location;

      b.   Collecting and maintaining biometric material, including photographs, audio recordings, and video footage;

      c.   Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

      d.   Collecting minors' information from third-party accounts;

      e.   Automatically collecting minors' information through tracking technologies;

      f.   Sharing minors' information with third parties and business partners; and

      g.   Failing to provide through their respective websites and apps a clear, understandable, and complete Privacy Policy describing the collection, use, and distribution practices in regard to users'—including minors'—personal information.

720.    The GTA Defendants' COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

721.    The Rocket League Defendants, in connection with Rocket League, violated COPPA and those violations include, but are not limited to:

a.  Deploying design tricks, known as dark patterns, to dupe millions of players (including minors like D.F.) into making unintentional purchases in its Rocket League game;

b.  Failing to notify parents that children had open access to in-game purchases and to obtain consent prior to processing purchases;

c.  Collecting personal data from children, including D.F., without first obtaining parents' verifiable consent despite being aware that many children were playing Rocket League;

d.  Requiring parents who requested that their children's personal information be deleted to jump through unreasonable hoops, and sometimes failed to honor such requests;

e.  Utilizing default settings that enable live on-by-default text and voice communications for users and these default settings harm children and teens— and violate COPPA because these default settings, along with each Defendant's role in matching children and teens with strangers to play Rocket League together, harmed children and teens, exposing children and teens to bullying, threats, harassment, and other dangerous and psychologically traumatizing issues such as suicide while playing Rocket League,

f.  Tricking users, including minors like D.F., into making purchases while playing Rocket League—more specifically, deploying a variety of dark patterns aimed at getting consumers of all ages to make unintended in-game purchases;

g.  Charging account holders, including Plaintiffs, without authorization and allowed minors, including D.F., to purchase in-game content without parental consent;

h.  Locking the accounts of customers who disputed unauthorized charges with their credit card companies; thereby revoking access to all the content they have purchased, which can total thousands of dollars and, even when accounts were unlocked, consumers were warned that they could be banned for life if they disputed any future charges; and

i.  Purposefully obscuring cancel and refund features to make them more difficult to find.

722.  The Rocket League Defendants' COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

723.  Epic Games, in connection with its Fortnite video game product, violated COPPA and those violations include, but are not limited to:

a.  Deploying design tricks, known as dark patterns, to dupe millions of players (including minors like D.F.) into making unintentional purchases in its Fortnite game;

b.  Failing to notify parents that children had open access to in-game purchases and to obtain consent prior to processing purchases;

c.  Collecting personal data from children, including D.F., without first obtaining parents' verifiable consent despite being aware that many children were playing Fortnite;

d.  Requiring parents who requested that their children's personal information be deleted to jump through unreasonable hoops, and sometimes failed to honor such requests;

e.  Utilizing default settings that enable live on-by-default text and voice communications for users and these default settings harm children and teens— and violate COPPA because these default settings, along with Epic Games's role in matching children and teens with strangers to play Fortnite together, harmed children and teens, exposing children and teens to bullying, threats, harassment, and other dangerous and psychologically traumatizing issues such as suicide while on Fortnite;

f.  Tricking users, including minors like D.F., into making purchases while playing Fortnite. More specifically, Epic Games has deployed a variety of dark patterns aimed at getting consumers of all ages to make unintended in-game purchases. Fortnite's counterintuitive, inconsistent, and confusing button configuration led players to incur unwanted charges based on the press of a single button. For example, players could be charged while attempting to wake the game from sleep mode, while the game was in a loading screen, or by pressing an adjacent button while attempting simply to preview an item. These tactics led to hundreds of millions of dollars in unauthorized charges for consumers;

g.  Charging account holders, including Plaintiffs, without authorization and allowed minors, including D.F., to purchase in-game content without parental consent;

h.  Locking the accounts of customers who disputed unauthorized charges with their credit card companies; thereby revoking access to all the content they have purchased, which can total thousands of dollars and, even when Epic Games agreed to unlock an account, consumers were warned that they could be banned for life if they disputed any future charges; and

i.  Purposefully obscuring cancel and refund features to make them more difficult to find.

724.  Epic Games's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

725.  Roblox Corp., in connection with its Roblox online game platform and game creation system, violated COPPA and those violations include, but are not limited to:

a.  Using a "voice chat" feature that requires users, including minors, to submit uniquely identifying scans of their face to utilize the feature under the guise of "age verification" when Roblox Corp. is using sophisticated artificial intelligence to create faceprints—as uniquely identifying as a fingerprint—to track the user and their gaming patterns;

b.  Allowing advertising to be surreptitiously interlaced with organic content in a multitude of ways, while knowing millions of young children are exposed to

that advertising daily;

    c.   Failing to adequately disclose to children when advertising is present withing experiences and videos on Roblox; and

    d.   Failing to ensure that social media influencers clearly and conspicuously disclose their material connections to Roblox in a manner that is understandable to children.

726. Roblox Corp.'s COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

727. The COD Defendants and Microsoft, in connection with the Call of Duty game series, violated COPPA and those violations include, but are not limited to:

    a.   Collecting and maintaining personal information from minors without parental consent;

    b.   Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

    c.   Retaining personal information obtained from minors without notifying parents or obtaining parental consent;

    d.   Using the data wrongfully collected from minors, specifically children age 13 or below, to analyze gamer behavior;

    e.   Tracking minors under the age of 13 through their respective gamer tags, and then using deceptive marketing strategies and patented technologies to ensure

minors remained engaged in the games, including but not limited to allowing minors to engage in microtransactions and purchase in-game products without parental consent;

f.   Allowing children, after creating an account, to create a profile that will include their "gamertag," and allowing them to upload a picture or include an avatar, which is a figure or image that represents the user. Defendants then combine this information with a unique persistent identifier created for each account holder, even children, and share this information with third parties;

g.   Allowing children to download the Call of Duty app and create a Call of Duty app account without parental consent, thereby allowing other known and unknown players to see when minors are online;

h.   Utilizing the Call of Duty app and built-in features to track minors' game play and analyze their game movement in order to create a heatmap, then using the wrongfully collected data to make in-game purchase recommendations, to encourage weekly game objectives, and to connect other known and unknown players to minors;

i.   Utilizing a deficient post-collection notice and verifiable parental consent process, including but not limited to:

      i.   Collecting personal information, from the child in violation of COPPA, and then suggesting that parents concerned with the collection of their children's information should contact them via their website;

ii.   Collected and released information about minors to third parties, as well as third party vendors, agents, employees, developers, agents and/or representatives without parental consent;

iii.  Failing to include the information required by 16 C.F.R. § 312.4(b);

iv.   Failing in the direct notice to describe Defendants' collection and use practices with regard to personal information collected from children and instead directed parents to the company's online notice of its information practices (the "Privacy Statement") while concealing the collection of data obtained on minors by third-party vendors and/or other game integrations; and

v.    Not disclosing in the direct notice to parents that Defendants intended to collect such personal information as images that could contain a child's likeness;

j.   Failing to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that Defendants collect personal information from children; and

k.   Failing to include a required disclosure in Defendants' Privacy Statement(s) explaining what personal information was collected from children or explaining Defendants' use and disclosure practices for personal information collected from children as required—and instead generically discussing information practices regarding Defendants' products and children using vague and ambiguous language.

728.    The COD Defendants and Microsoft's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

729.    Madden NFL Defendants, in connection with Madden NFL, violated COPPA and those violations include, but are not limited to:

      a.  Collecting and maintaining personal information from minors without parental consent;

      b.  Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

      c.  Retaining personal information obtained from minors without notifying parents or obtaining parental consent; and

      d.  Using the data wrongfully collected from minors, specifically children age 13 and under, to analyze gamer behavior.

730.    Madden NFL Defendants' COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

731.    Sony, in connection with its PlayStation game consoles and PlayStation Network, including but not limited to its PlayStation 4, PlayStation 5, and PlayStation Essentials, violated COPPA and those violations include, but are not limited to:

a.  Collecting personal information from children who signed up to its PlayStation Network, PS Plus, PlayStation Store, and any other product within the PlayStation group without notifying their parents or obtaining their parents' consent, and by illegally retaining children's personal information;

b.  Allowing children, after creating an account on PlayStation, to create a profile that will include their "PSN"—a unique online ID—and allowing them to upload a picture or include an avatar, which is a figure or image that represents the user. Sony then combines this information with the information Sony collects and links to each user, including the games played, products owned, and actions taken while on a PlayStation device and/or network;

c.  Utilizing third parties to collect personal information and activity from minors without parental consent;

d.  Sharing personal information of minors with third parties, including service providers, game publishers, and Sony business partners;

e.  Requiring users or parents to take additional steps to opt out if they do not want unnecessary data collected; and

f.  Using the data collected on minor children less than 13 years old to use a patented system of analyzing gamer behavior, tracking kids with their respective PSN ID, and using a deceptive marketing of in-game purchases or prepaid cards to ensure minors remained engaged in the games which proximately caused the addiction and/or IGD.

732.  Sony's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors—including

136

D.F.—and to design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

733.     Defendants have violated statutory and regulatory law, as identified above, and with each statutory violation, each Defendant proximately caused injury and damage to Plaintiffs. This damage includes the injuries and harms to Plaintiffs described above, including but not limited to D.F.'s addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's statutory violations, D.F. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

734.     Plaintiffs are within the class of persons that these statutes and regulations are intended to protect—and Plaintiffs' injuries and damages are the type of harm that these statutes and regulations are intended to prevent—therefore, each Defendant is *per se* negligent for violating the COPPA.

## COUNT IX
## NEGLIGENCE – ORDINARY
### (Against All Defendants)

735.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

736.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing,

advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by D.F.: Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of Duty Modern Warfare 3, Madden 24, PlayStation 4, and PlayStation 5.

737.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

738.    Each of the Defendant's respective products are also marketed and advertised to young adults and minors, including D.F.

739.    Each Defendant owed D.F. a duty to act as a reasonably careful company would under the circumstances.

740.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

741.    A reasonably careful company would protect D.F. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

742.    A reasonably careful company would not invite, encourage, or facilitate youth, including D.F., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

743.    A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant did just that. More specifically:

    a.  The GTA Defendants failed to disclose that Grand Theft Auto was designed to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive

use by foreseeable users, *i.e.*, minors, young adults, and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

b. The Rocket League Defendants failed to disclose that they designed Rocket League to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

c. Epic Games failed to disclose that it designed the Fortnite games with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

d. Roblox Corp. failed to disclose it designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not

limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.  The COD Defendants and Microsoft failed to disclose that the Call of Duty games were, and are, designed with addictive features to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

f.  Madden NFL Defendants failed to disclose that it designed Madden NFL to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm; and

g.  Sony failed to disclose that it Sony designed its PlayStation consoles (including PlayStation 4 and PlayStation 5) with addictive features and for use with addictive video game products, and designed its PlayStation Network, including PlayStation Essentials, with addictive features to be used with its PlayStation consoles and as a product to house, purchase, and use addictive video game products, while knowing that abuse, addiction, and compulsive use

by foreseeable users, *e.g.*, minors, can lead to brain damage and injury and, as such, the products pose significant risk of harm.

744.    D.F. was a foreseeable user of the Defendants' respective products.

745.    Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of D.F.'s use of Defendants' respective products.

746.    Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth, including D.F., in a reasonably foreseeable manner. More specifically: each Defendant should have known this because each designed their respective gaming products with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, physical damage to the brain, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

747.    At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth, including D.F., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

748.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, including D.F., would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited

to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

749.    Each Defendant's conduct was closely connected to Plaintiffs' injuries and damages, which were highly certain to occur.

750.    Each Defendant could have avoided Plaintiffs' injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed D.F.

751.    Each Defendant also owes a particularly heightened duty of care to users under the age of 13 due to the recognized safety risks posed to such users from interactive online products, such as each of the Defendants' respective products.

752.    Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular gameplay to avoid such risks.

753.    Each Defendant has breached the duties owed to D.F.

754.    Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

        a.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that

unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including D.F.;

b. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including D.F., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including D.F.;

d. Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, including D.F.; and

e. Facilitating use of their respective products by youth under the age of 13, including D.F., by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

755. Each Defendant has breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance,

operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

    a.  Failing to implement effective protocols to block users under the age of 13;

    b.  Failing to implement effective parental controls;

    c.  Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

    d.  Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

    e.  Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

    f.  Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

756.    Each Defendant further breached the duty owed to Plaintiffs by failing to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.*

757.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users including D.F.; yet Defendants did not do this.

758.    As a direct and proximate result of each Defendant's breach of one or more of its duties, D.F. has been injured and Plaintiffs were harmed. Such injuries and harm include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

759.    Each Defendant's breach of one or more of its duties is a proximate cause of D.F.'s injuries and the damages sustained by Plaintiffs.

760.    As a direct and proximate result of each of the Defendant's breach of duties, D.F. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

761.    Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT X
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

762.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

763.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by D.F.: Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of Duty Modern Warfare 3, Madden 24, PlayStation 4, and PlayStation 5.

764.    As described herein, each of the Defendants designed its respective products to be addictive to young adults and minors, including D.F., who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

    a.   The GTA Defendants designed Grand Theft Auto to be as addictive as possible and to include various addictive tactics, including but not limited to endless activities, exciting in-game products and prizes for players to earn, and daily objectives;

    b.   The Rocket League Defendants designed Rocket League to be as addictive as possible and to include various addictive tactics, including but not limited to continuous mutator updates, varied gameplay, and offering daily items in the Item Shop;

    c.   Epic Games designed Fortnite to be as addictive as possible, employing numerous psychological tricks, tactics, and technologies to ensnare users into extended, compulsive, abusive, and addictive use of its product, including but not limited to, designing the game to include a "near miss" effect, random rewards, bright and vibrant colors, and continual gameplay variety;

    d.   Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

    e.   The COD Defendants designed the Call of Duty games to be as addictive as possible and to include various addictive tactics, including but not limited to feedback loops, fast-paced play, and dopamine lifts from satisfying graphics

and sounds, to keep users engaged with and spending money on the COD Defendants' video games;

f.   Madden NFL Defendants designed Madden NFL to be as addictive as possible and to include various addictive tactics, including but not limited to endless activities in MUT; exciting in-game products and prizes for players to earn, and daily objectives; and

g.   Sony designed its PlayStation consoles with addictive features and for use with addictive video game products, and designed its PlayStation Network (including but not limited to its PlayStation Store and PlayStation Plus) for use with its PlayStation consoles and to supply and house addictive video game products, to take advantage of the chemical reward system of users' brains.

765.   Each Defendant designed its respective products to take advantage of the chemical reward system of users' brains (especially young users, including D.F.) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

a.   The GTA Defendants designed Grand Theft Auto in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals;

b.   The Rocket League Defendants designed Rocket League in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

c.   Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

    d.   Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

    e.   The COD Defendants designed the Call of Duty games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

    f.   Madden NFL Defendants designed Madden NFL in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals; and

    g.   Sony designed its PlayStation consoles, PlayStation Network, PlayStation Store and PlayStation Plus in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure that minor and young adult users continually purchase addictive video game products for play on PlayStation consoles and/or PlayStation Network in order to ensure the addiction of minor users.

766.   Defendants intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors, including D.F., to use each Defendants' respective product and for users, including D,F., to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics.

767.   Each Defendant's conduct in designing and developing its products to purposefully addict and harm users—especially minors and neurodivergent individuals—was extreme and outrageous, is beyond all possible bounds of decency, and utterly intolerable in a civilized community.

768.    Each Defendant's conduct in designing and developing its products to purposefully addict and harm users—especially minors and neurodivergent individuals—was an abuse of power to affect the interests of users, including D.F.

769.    Each Defendant knew that users, including D.F., would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so Defendants can continue to profit off of users, including D.F., after initial purchase or download.

770.    Each Defendant intended to inflict emotional distress (*e.g.*, causing addiction) on users, including D.F., and knew that users, including D.F., would suffer emotional distress as a result of Defendants' conduct.

771.    Plaintiffs have sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct. More specifically, the family has endured D.F.'s bouts of gamer's rage and depression which has required out-patient counseling and additional support services in school.

772.    Such conduct in intentionally creating products to addict and abuse children and cause them severe mental and physical harm is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community and Defendants knew there was a high probability the addicted minor would have gamer's rage and withdrawal symptoms which would cause emotional distress to the gamer, parents, and other household members.

773.    No reasonable person would be expected to endure such emotional distress suffered by Plaintiffs as a result of each Defendant's conduct.

774.    D.F. was particularly susceptible to emotional distress from each Defendant's respective conduct due to D.F.'s age and mental capabilities.

775.    As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, Sonya Foster has experienced extreme emotional distress, extreme financial stress, family conflict (including fear of being injured or hurt by D.F. if Sonya Foster tries to prohibit D.F. from using Defendants' products), and mental anguish, and is required (and will require) additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

776.    As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, D.F. has experienced extreme emotional distress, including depression and anxiety related to D.F.'s inability to function at grade level without additional support services in the classroom and out-patient counseling, and mental anguish associated with the effects of D.F.'s gaming addiction.

777.    As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. More specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

778.    Further, each Defendant's outrageous conduct, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT XI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

779.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

780.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by D.F.: Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of Duty Modern Warfare 3, Madden 24, PlayStation 4, and PlayStation 5.

781.   Each Defendant owed D.F. and Sonya Foster a duty to act as a reasonably careful company would under the circumstances.

782.   A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

783.   A reasonably careful company would protect D.F. and Sonya Foster from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

784.   A reasonably careful company would not invite, encourage, or facilitate youth, including D.F., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

785.   A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant defectively designed its respective products to be addictive to young adults and minors, including D.F., who were particularly unable

to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

    a.   The GTA Defendants designed Grand Theft Auto to be as addictive as possible and to include various addictive tactics, including but not limited to endless activities, exciting in-game products and prizes for players to earn, and daily objectives;

    b.   The Rocket League Defendants designed Rocket League to be as addictive as possible and to include various addictive tactics, including but not limited to continuous mutator updates, varied gameplay, and offering daily items in the Item Shop;

    c.   Epic Games designed Fortnite to be as addictive as possible, employing numerous psychological tricks, tactics, and technologies to ensnare users into extended, compulsive, abusive, and addictive use of its product, including but not limited to, designing the game to include a "near miss" effect, random rewards, bright and vibrant colors, and continual gameplay variety;

    d.   Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

    e.   The COD Defendants designed the Call of Duty games to be as addictive as possible and to include various addictive tactics, including but not limited to feedback loops, fast-paced play, and dopamine lifts from satisfying graphics

and sounds, to keep users engaged with and spending money on the COD Defendants' video games;

f.  Madden NFL Defendants designed Madden NFL to be as addictive as possible and to include various addictive tactics, including but not limited to endless activities in MUT; exciting in-game products and prizes for players to earn, and daily objectives; and

g.  Sony defectively designed its PlayStation consoles and PlayStation Network (including but not limited to PlayStation 4, PlayStation 5, and PlayStation Essentials) with addictive features, including but not limited to rotating game libraries and engaging graphics, to take advantage of the chemical reward system of users' brains, and designed its PlayStation video game products for use with and to store addictive video game products.

786.    Each Defendant defectively designed its respective products to take advantage of the chemical reward system of users' brains (especially young users including D.F.) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

a.  The GTA Defendants designed Grand Theft Auto in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals;

b.  The Rocket League Defendants designed the Rocket League games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

c. Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

d. Roblox Corporation designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

e. The COD Defendants designed the Call of Duty games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

f. Madden NFL Defendants designed Madden NFL in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals; and

g. Sony designed its PlayStation consoles, PlayStation Network, PlayStation Store and PlayStation Plus in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure that minor and young adult users continually purchase addictive video game products for play on PlayStation consoles and/or PlayStation Network in order to ensure the addiction of minor users.

787.    D.F. was a foreseeable user of the Defendants' respective products, and Sonya Foster was a foreseeable parent of a user of Defendants' products.

788.    Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of D.F.'s use of Defendants' respective products.

789.    Defendants' products, including Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of Duty Modern Warfare 3, Madden 24, PlayStation

154

4, and PlayStation 5, are psychologically and neurologically addictive when used in their intended manner by their intended audience; and Defendants reasonably should have known that when used as intend by minors, including D.F., to use each Defendants' respective product and for users, including D.F., to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics.

790.    Each Defendant knew that users, including D.F., would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and made them addictive to these vulnerable consumers so Defendants can continue to profit off of users, including D.F., after initial purchase or download.

791.    At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth, including D.F., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

792.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users, including D.F., of its respective products, including D.F., would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

793.    Each Defendant has breached the duties owed to D.F. and Sonya Foster.

794.    Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

      a.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including D.F.;

      b.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including D.F, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

      c.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including D.F.; and

      d.  Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, including D.F.

795.    Each Defendant has breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.  Failing to implement effective protocols to block users under the age of 13;

b.  Failing to implement effective parental controls;

c.  Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.  Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

e.  Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

f.  Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

796.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users, including D.F., and parents of youth users, including Sonya Foster; yet Defendants did not do this. This was a breach of duties owed to Plaintiffs.

797.    Each Defendant's conduct was closely connected to Plaintiffs' emotional distress, which was highly certain to occur.

798.    As a direct and proximate result of each Defendant's breach of one or more of its duties, Plaintiffs have sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

799.    As a direct and proximate result of each of the Defendants' negligent conduct and infliction of emotional distress, D.F. has experienced extreme emotional distress, including brain damage, severe emotional distress, diminished social interactions, loss and lack of friends, lack of interest in sports and hobbies, poor hygiene, changes in eating pattern, and withdrawal symptoms such as rage, anger, and physical outbursts, and is required (and will require) additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

800.    As a direct and proximate result of each of the Defendants' negligent conduct and infliction of emotional distress, Sonya Foster has experienced extreme emotional distress.

801.    As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. More specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

802.    Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT XII
## CIVIL CONSPIRACY
### (Against All Defendants)

803.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

804.     A civil conspiracy requires a malicious combination of two or more persons that causes injury to person or property and the existence of an underlying unlawful tort independent of the conspiracy itself. Such a conspiracy occurred here.

805.     Defendants conspired to make Defendants' products, specifically the products described herein, addictive to users, including D.F.

806.     As described herein, each Defendant engaged in tortious conduct causing serious injury to Plaintiffs.

807.     As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like D.F., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by D,F. and other users.

808.     Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors like D.F., addicted to Defendants' products.

809.     More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like D.F., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

810.    As described herein, the GTA Defendants knowingly conspired and otherwise acted in concert with each other to design a video game product that is addictive and harmful to users, and with Sony to engage in tortious conduct and violate OCSPA, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

811.    In particular, the GTA Defendants and Sony knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Grand Theft Auto games that addicted and harmed D.F. and Sonya Foster.

812.    As described herein, the Rocket League Defendants knowingly conspired and otherwise acted in concert to engage in tortious conduct and violate OCSPA when they design Rocket League to addict minors and young adults.

813.    In particular, the Rocket League Defendants knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Rocket League game that addicted and harmed D.F.

814.    As described herein, Epic Games knowingly conspired and otherwise acted in concert with Sony to design a video game product that is addictive and harmful to users, and with Sony to engage in tortious conduct and violate OCSPA, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

815.    In particular, Epic Games and Sony knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and

deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Fortnite video game product, and that addicted and harmed D.F.

816.    As described herein, Roblox Corp. knowingly conspired and otherwise acted in concert with Sony to design a video game product that is addictive and harmful to users, and with Sony to engage in tortious conduct and violate OCSPA, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

817.    In particular, Roblox Corp. and Sony knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from their harmful Roblox video game product, and that addicted and harmed D.F.

818.    As described herein, the COD Defendants and Microsoft knowingly conspired and otherwise acted in concert with each other to design a video game product that is addictive and harmful to users, and with Sony to design a video game product that is addictive and harmful to users, and with Sony to engage in tortious conduct and violate OCSPA, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

819.    In particular, the COD Defendants, Microsoft, and Sony knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Call of Duty games that addicted and harmed D.F.

820.    As described herein, Madden NFL Defendants knowingly conspired and otherwise acted in concert with Sony to design a video game product that is addictive and harmful to users, and with Sony to engage in tortious conduct and violate OCSPA, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

821.    In particular, Madden NFL Defendants knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Madden NFL that addicted and harmed D.F.

822.    As described herein, Sony conspired with and acted in concert with all other Defendants to distribute, market, supply, and/or sell the Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of Duty Modern Warfare 3, and Madden 24 video games and all in-game downloadable products and in-game purchases contained therein through the PlayStation Network; to design a video game product that is addictive and harmful to users, and with Sony to engage in tortious conduct and violate OCSPA, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

823.    In particularly, Sony and all other Defendants knowingly agreed to, coordinated its efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively distribute, market, supply, sell, and benefit from consumers purchase and use of the Grand Theft Auto, Rocket League, Fortnite, Roblox, Call of Duty Modern Warfare 2, Call of Duty Modern Warfare 3, and Madden 24 video games and all in-game downloadable products and in-game purchases made available through the PlayStation Network, and that addicted and harmed D.F.

824.    Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its respective product to users, including D.F., while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries).

825.    Each Defendant shared a common purpose of fraudulently concealing the unreasonable risk of harm in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including Plaintiffs.

826.    These conspiracies allowed Defendants to maximize profits, all while causing significant harm to users.

827.    Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the conspiracies described herein.

828.    Plaintiffs' injuries and damages cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

829.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' products. As a proximate result of Defendants' conspiring to make their games addicting, D.F. continues to suffer injuries and is unable to stop using Defendants' respective products as a result of D.F.'s addiction, Defendants' defective design and Defendants' failure to warn consumers, including D.F., about the addictive qualities and components of those products.

**COUNT XII**
**VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT O.R.C. 1345.02 *et. seq.***
**(Against All Defendants)**

830.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

831.    D.F. is a "Consumer" under O.R.C. 1345.01(D).

832.    Defendants are "Suppliers" under O.R.C. 1345.01(C).

833.    Defendants and D.F. engaged in "Consumer Transactions" under O.R.C. 1345.01(A).

834.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by D.F.: Fortnite, Roblox, Call of Duty, Grand Theft Auto, PS4, PS5, PlayStation Essentials, PlayStation Store.

835.    Each of the Defendant's respective products are also marketed and advertised to young adults and minors, including D.F.

836.    Ohio law prohibits-and deems it unlawful for any Defendant to engage in unfair or deceptive acts or practices, including but not limited to the subject of a consumer transaction being of a particular standard, quality, grade, style, prescription, or model, if it is not.

837.    Each Defendant engaged in unfair or deceptive acts or practices in connection with the sale and advertisements of its gaming product, identified herein and therefore violated the OCSPA, 1345 O.R.C. § 1345.01 et. seq. Those violations include but are not limited to the subject of a consumer transaction being of a particular standard, quality, grade, style, prescription, or model, if it is not.

838.    Each Defendant engaged in the aforementioned unfair or deceptive acts or practices in the conduct of their trade as a course of business, and in connection with the sale of goods or services to Ohio consumers, including Plaintiffs.

839.    Each Defendant intended for consumers, including D.F., to rely on their unfair and deceptive acts described herein, including their respective deceptive conduct in regard to in-game purchases and microtransactions, platforms, products, and in the concealment of material information regarding the safety of their products.

840.    Each Defendant intended for consumers, including D.F., to be unfairly treated by their unfair and deceptive conduct and to become addicted, abuse, or compulsive use of their respective products in an effort to increase their own profits.

841.    Defendants' actions detailed herein constitute unfair methods of competition and unfair or deceptive acts and trade practices in violation of the OCSPA and those actions have caused Plaintiffs to suffer actual economic damages.

842.    Any reasonable consumer would have relied to their detriment on each Defendant's unfair and deceptive acts, detailed herein.

843.    Plaintiffs relied to their detriment on each Defendant's unfair or deceptive acts, including Defendants' respective misrepresentations and deceptions, in deciding to use Defendants' gaming products.

844.    Had each Defendant not engaged in the respective unfair and deceptive conduct described herein, D.F. would not have used each Defendant's respective products and Plaintiffs would not have been damaged.

845.    As a proximate result of each Defendant's violations of the OCSPA, described above, Plaintiffs suffered actual calculable financial loss and continues to suffer such losses because Defendant's harm is ongoing.

846.    Each Defendant violated the OCSPA in the manner described herein and, as a result of Defendants' countless violations of the OCSPA, Plaintiffs are entitled to actual damages in an

amount to be proven at trial, costs, and reasonable attorney's fees incurred in connection with prosecuting this claim.

847.    Plaintiffs also seek injunctive relief that would require Defendants to cease and desist from engaging in the deceptive and unlawful conduct described herein, including but not limited to, enjoining Defendants from continuing to direct and market microtransactions to anyone under the age of 18 years of age, enjoining online gaming access to minors pursuant to advice from a medical professional to safely transition the minors through a healthy withdrawal from their gaming addiction, and/or other measures deemed to be appropriate upon further discovery of the extent of Defendant's harms.

848.    Plaintiffs' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

849.    The nature of the intentional and fraudulent acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, D.F. continues to use Defendants' respective products. While D.F. uses Defendants' respective products, they will not be able to independently verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

850.    Each Defendant engaged in unfair and deceptive trade practices, as described above, which was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, outrageous, unlawful, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including D.F. This misconduct warrants an award of punitive damages in an amount—

imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

**COUNT XIII**
**LOSS OF FILIAL CONSORTIUM**
**(Against All Defendants)**

851.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

852.    Plaintiff Sonya Foster has suffered a loss of consortium and has been deprived of the loss of the services, society, companionship, comfort, love and solace of her child, D.F., when he became addicted to and was otherwise injured by Defendants' products.

853.    Sonya Foster's loss was a direct and proximate result of Defendants' acts and/or omissions as described above.

854.    As a direct and proximate result of Defendants' conduct, Sonya Foster was permanently injured and incurred damages.

**VII. PRAYER FOR RELIEF**

855.    Plaintiffs Sonya Foster, Individually and on behalf of D.F., a minor, respectfully request judgment in their favor and against each of the Defendants to the full extent of the law, as follows:

    a.   That this Court enter judgment in Plaintiffs' favor on each claim;

    b.   That this Court award Plaintiffs compensatory damages for economic and noneconomic loss in accordance with the governing law;

    c.   That this Court award Plaintiffs pre- and post-judgment interest;

    d.   That this Court consider allowing Plaintiffs to amend the instant complaint to allege punitive damages during the course of discovery;

e.  That this Court award reasonable and necessary attorneys' fees, costs, and
expenses of suit along with pre-judgment interest on those sums; and

f.  That this Court award other relief to which Plaintiffs are entitled.

## JURY DEMAND

Plaintiffs hereby demand a jury trial for all issues so triable in this action.

CONSTANT LEGAL GROUP

/s/ *Edward J. Kelley*
Ryan J. Cavanaugh (0079996)
Constantine P. Venizelos (0078596)
Edward J. Kelley (0096082)
Michael P. Knopf (0102454)
737 Bolivar Rd., Ste. 440
Cleveland, OH 44115
(216) 333-6707
(216) 274-9365 (facsimile)
ryan@constantllp.com
dean@constantllp.com
ed@constantllp.com
michael@constantllp.com

*Attorneys for Plaintiffs Sonya Foster, individually
and on behalf of D.F., a minor*